ROBINSON & CO. ET AL. *v.* UNITED STATES (No. 2662)[1]

CONSTRUCTION, SECTION 302, TARIFF ACT OF 1921—"EXPORT VALUE"— "OFFERED FOR SALE."

Under section 302, emergency tariff act (1921), mere offers for sale, if made to all persons desiring to purchase goods for export to the United States, were just as good evidence of export value as sales actually made. Laces were freely offered for sale in Switzerland for export to the United States to all persons, at a price in United States money delivered in New York. Shipment was made to the manufacturer's agent, title remaining in the manufacturer until delivery to the purchaser. Appraisement was correctly made at that price, less duties, costs, charges, and expenses. It should not have been made, as invoiced and entered, at the actual value in the foreign money for home consumption. Where or when the title passed was immaterial.

United States Court of Customs Appeals, March 27, 1926

APPEAL from Board of United States General Appraisers, G. A. 9021 (T. D. 40997)

[Affirmed.]

*John R. Rafter* for appellants.

*Charles D. Lawrence*, Assistant Attorney General (*Fred J. Carter*, special attorney, of counsel), for the United States.

[Oral argument January 22, 1926, by Mr. Rafter and Mr. Carter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

SMITH, Judge, delivered the opinion of the court:

Laces ordered either directly from the manufacturer in St. Gall, Switzerland, or through the manufacturer's agent in New York,

---

[1] T. D. 41486.

were invoiced and entered at their actual value in francs for home consumption in Switzerland. The appraiser appraised the laces at their export value under section 302 of the emergency tariff act, which value he found to be the net price in American currency fixed for the goods when the orders were placed and accepted, less United States import duties and the costs, charges, and expenses incurred for bringing the merchandise from the place of shipment in Switzerland to the place of delivery in the United States.

On appeal to reappraisement the appraised value was affirmed, but on appeal to re-reappraisement the export value was fixed in accordance with paragraph 3 of the following stipulation entered into by the parties:

It is hereby stipulated and agreed:

1. That the appraisement was made under section 302 of the emergency act at the net prices at which the orders for the merchandise were placed and accepted, less an allowance intended to cover costs, charges, and expenses, and United States import duties incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States.

2. That whether the orders for the merchandise were placed with and accepted by the manufacturers' agents in New York, or placed with and accepted by the manufacturers in St. Gall, they would have been received at the same prices expressed in dollars and cents and subject to the same terms and conditions.

3. That if the appraiser's interpretation of section 302 of the emergency tariff act as expressed in paragraphs 1 and 2 hereinabove is correct, then the export value of the items in question is equal to the corrected values noted in red ink on Exhibits 3 and 6.

4. That the invoice and entered values correctly represent the actual market values for home consumption in the country of exportation.

This stipulation is intended to supplement the record heretofore made.

The parties in interest protested against the liquidation of the entries on the basis of the final appraisement and that protest was overruled by the Board of General Appraisers, sitting as a classification board, and from the judgment of the board this appeal was taken.

It appears from the record that, whether orders be taken in the United States or in Switzerland, all laces exported to the United States must be paid for in United States currency, and that the price for which such laces are sold includes cost, insurance, freight and duty paid f. o. b. at purchaser's place of business, New York City, or f. o. b. railroad station New York City, if the purchaser's place of business be at a point beyond the limits of the city. All laces, whether ordered directly from the manufacturer in St. Gall or through the manufacturer's agent in New York, are consigned to the manufacturer's agent in New York and billed by the consignee in the consignee's own name to the persons, firms, or corporations placing the order for the laces. Payments for the laces are made to the

agents and consignees of the manufacturer and title to the laces remains in the St. Gall manufacturers and shippers until said goods have been actually delivered to the persons, firms or corporations placing the order for them.    Until the goods are delivered the manufacturers and shippers thereof assume all risk and any losses or damages to the goods while in transit must be borne by them.    The manufacturer fixes the minimum prices at which the laces can be sold by the agents in the United States, but the agents may sell for higher prices than the minimum and they are entitled to the difference between the minimum and the higher price in addition to their regular commission.    In case a person, firm, or corporation refuses to accept the goods or to make demand therefor, any loss resulting from such default is shared by the manufacturer and the agent.    Laces, such as those imported, were at the time of their exportation freely offered for sale to all purchasers for a price in American money which included the value of the goods, cost, insurance, freight and duty paid, delivered at purchaser's place of business in New York City or at the railroad station in New York City, if the purchaser's place of business was beyond the limits of the city.

On the facts recited the importer contends, first, that the laces were not sold in Switzerland for export to the United States inasmuch as the title to them and the possession of them remained in the manufacturer until after their arrival in the United States; second, that no offers for sale can be considered as evidence of export value if such offers relate to sales actually accomplished in this country and not to sales to be completed in the foreign country.

We can not agree with either contention.    Where or when the title passed from the foreign seller to the purchaser has nothing whatever to do with export value as defined in section 302, which reads as follows:

SEC. 302. That for the purposes of this title the export value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States, and plus, if not included in such price, the amount of any export tax imposed by the country of exportation on merchandise exported to the United States.

If that section had provided that export value was the price at which merchandise was *sold* to all purchasers in the principal markets

of the country from which exported, there might be some ground for saying that the appraisement was not made in accordance with law. Section 302 does not so provide, however, and clearly contemplates not only actual sales, but offers for sale freely made to all purchasers for export to the United States. Under the emergency tariff act mere offers for sale if made to all persons desiring to purchase goods for export to the United States were just as effective in making export value as sales actually made and concluded. In fact, section 302 seems to have been framed to meet just such transactions and agreements as those involved in this appeal, providing as it does, that United States import duties, costs, charges, and expenses incident to bringing the merchandise from the country of exportation to the place of delivery in the United States shall, when included in the price, be deducted therefrom to ascertain export value.

If Congress intended that only sales passing title should be determinative of export value, it would have defined export value as the price at which merchandise was *sold* for export to the United States and left out of the "equation" the price at which such merchandise was freely offered for sale to all purchasers. And if offers for sale had been left out, export value would have been nothing more than an abstraction worthless for tariff purposes unless sellers and purchasers so willed it. Possibly that was the reason that section 302 did not make export value dependent on actual sales. The orders and acceptances in this case were something more than mere offers to sell. They were binding agreements to *buy* and *sell* and were therefore just as dependable as actual sales for the purpose of ascertaining values.

The judgment of the board is *affirmed.*