## F. C. GERLACH & CO. ET AL. v. UNITED STATES

**No. 5084.**—Invoices dated Singen-Hohentwiel, Germany, September 23, August 21, 1936.
Certified September 29, August 29, 1936.
Entered at New York October 9, September 14, 1936.
Entry Nos. 749030, 734222.

(Decided January 8, 1941)

*Eugene R. Pickrell* for the plaintiffs.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

DALLINGER, Judge: These appeals to reappraisement involve the question of the dutiable values of certain aluminum foil in rolls exported from Germany in September 1936 and entered at the port of New York.

Reappraisement 128263-A covers an importation of aluminum foil of .00035-inch gauge which was entered at the invoice price less nondutiable charges, as representing the export value. This merchandise was appraised on the basis of foreign value at 3.50 reichsmarks per kilo, less 2 per centum discount, plus cases and packing.

Reappraisement 128264-A covers an importation of aluminum foil of .002-inch gauge which was entered at the invoice price, less nondutiable charges, as representing the export value. This merchandise was appraised on the basis of foreign value at 2.85 reichsmarks per kilo, less 2 per centum, plus cases and packing.

The plaintiffs contend that there is no foreign value for such or similar merchandise for home consumption in Germany; that the home market is a restricted market; and that while there is evidence of unrestricted sales of similar merchandise for export to countries other than the United States, such sales are at prices less than the export value which the plaintiffs contend is the proper basis for determining the value of said merchandise.

On the other hand, the Government contends that the foreign value as found by the appraiser is the correct dutiable value of the merchandise.

The record is quite voluminous consisting of 133 typewritten pages of oral testimony and 19 exhibits. Eleven of said exhibits were offered by the plaintiffs and eight by the Government. Three witnesses appeared for the plaintiffs and one for the Government. But the testimony of plaintiffs' third witness and of the Government witness, as well as exhibits 11 to 14 inclusive, need not be considered, for the reason that they relate solely to a motion made by counsel for the plaintiffs that the appraisements herein be declared null and void on the ground that there had been no proper examination of the merchandise at bar by the appraiser. The testimony of the Government witness, however, was so conclusive on this point that the plaintiffs' motion was denied at the trial and an exception allowed. Inasmuch, however, as counsel for the plaintiffs makes no reference to this matter in his brief, I conclude that he is satisfied that his motion was properly denied.

The first question to be decided herein is whether there existed any foreign value for the instant merchandise at the time of its exporta-

tion. That question must be answered in the negative before any proof of export value as alleged by the plaintiffs may be considered.

According to the uncontradicted evidence contained in the affidavit of the plant manager of the foreign manufacturer (collective exhibit 8) there are numerous differences in composition, quality, cost, and use of aluminum foil sold for home consumption in Germany and that sold for export to the United States. The foil sold for home consumption was manufactured from standard quality aluminum 99.3 to 99.5 per centum pure, whereas that sold for export to the United States was manufactured from a mixture of standard aluminum and scrap aluminum. Again, the foil sold for home consumption was softer, less brittle, and had less tensile strength than that sold for export to the United States. Moreover, the foil sold for export to the United States was produced in wider rolls and generally was of greater thickness or gauge than that sold for home consumption.

Furthermore, the foil exported to the United States was specially produced and sold for use in cigarette, chewing gum, and chocolate-packing machines and on finishing machines, which differ from and operate at a higher average rate of speed than the machines used in Germany.

Finally, during the period from January 1, 1935 to October 20, 1939, the price for scrap aluminum ranged from .80 to .95 reichsmarks, whereas the price of standard quality aluminum of a purity of 99.3 to 99.5 per centum ranged from 1.33 to 1.44 reichsmarks. As a result of these various factors, the cost of production of aluminum foil sold for export to the United States was from 10 to 25 per centum lower than the production cost of aluminum foil sold for home consumption in Germany.

From the foregoing it is evident that the aluminum foil at bar is not similar in a tariff sense to the aluminum foil sold for home consumption in Germany. *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714.

There is also ample evidence in the record that aluminum foil is not freely offered for sale for home consumption in Germany.

In his affidavit (exhibit 9), the managing director of the Aluminum Foil Association and the Convention for Aluminum Covered Paper, which are cartels comprising in their membership all of the manufacturers of aluminum foil and aluminum metal covered paper in Germany, states that from January 1, 1934, to October 18, 1939, the said Aluminum Foil Association fixed the prices at which aluminum foil could be sold for home consumption by the manufacturers, and that a penalty of 1 reichsmark per kilogram was imposed when foil was sold at prices lower than those fixed.

Moreover, the manufacturers were prohibited from selling their foil to concerns not on their published lists although there existed other possible purchasers for home consumption in Germany.

Furthermore, since April 1, 1935, all manufacturers have been required by the Association to stipulate in their offers of sale and in their sales that all purchasers from them must use the foil themselves and must not resell the same. A fine is imposed for any violation of this latter restriction combined with a refusal to sell the violator any more aluminum foil.

The foregoing evidence is corroborated by the testimony of the sales manager of two German foil manufacturers, as set forth in collective exhibit 7. This evidence is also corroborated by Treasury Attachés Paul Hermes and Erwin G. May in their reports which were admitted in evidence as exhibits 15 and 17, respectively.

In view of this overwhelming evidence it is apparent that the sales of aluminum foil for home consumption in Germany, evidently relied upon by the appraiser, cannot be considered as a basis for determining foreign value. *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351, T. D. 39158; and *J. H. Cottman & Co.* v. *United States*, 20 C. C. P. A. 344, T. D. 46114.

There is considerable evidence in the record that aluminum foil was freely offered for sale for export to countries other than the United States; and evidence was introduced by the plaintiff to prove that such sales were at prices lower than the export value of the goods shipped to the United States. I am satisfied, however, that although the importations herein occurred previous to the enactment of the Customs Administrative Act of 1938, nevertheless in view of the fact that sales for home consumption in Germany were restricted, sales of such or similar merchandise for export to countries other than the United States may not be considered to have been freely offered to all purchasers, within the meaning of section 402 (d) of the Tariff Act of 1930.

In the recent case of *United States* v. *Half Moon Manufacturing & Trading Co. Inc.*, C. A. D. 115, in which the appellate court affirmed my decision and that of the Third Division of this court sitting in review, that no foreign value can be found where the home market was restricted, the findings of fact were the same as in the instant case, to wit, that while there existed a restricted market for home consumption in the country of exportation, there also existed an unrestricted market for the sale of said merchandise to countries other than the United States. To like effect is the decision in *United States* v. *Paul J. Pauls*, C. A. D. 116.

It being now established that the appraiser erred in finding a foreign value for the merchandise at bar, the next question that arises is

whether the plaintiffs have proved that there existed an export value for said merchandise.

In this connection we are confronted with the contention of Government counsel that because of the existence of a certain exclusive selling agency contract between the foreign manufacturer and Adolphe Hurst & Co., Inc., one of the plaintiffs herein, there can exist no export value for the merchandise at bar. The contract in question, together with its translation, is in evidence as exhibit 1. Under its terms the said corporation is granted the sole representation or sole selling rights on the said manufacturers' products "for the United States of America," subject to various conditions. Whenever the said corporation purchases the merchandise outright, it is allowed a 5 per centum discount. In such cases, said corporation assumes all credit risks in the United States. On the other hand, whenever the said corporation sells on a commission basis, the shipper assumes all credit risks and said corporation receives a 5 per centum commission on the sale prices.

Paragraph 11 (c) of said contract reads as follows:

The decision as to whether orders are to be considered as having been definitively accepted is vested in the Party of the First part (The Breisgau-Walzwerk G. m. b. H., Teningen, and the Aluminum-Walzwerke Singen, Dr. Lauber, Neher Co. G. m. b. H., Singen).

Paragraph 11 (f) reads as follows:

The Party of the First Part furthermore has the right to do business directly with the customers, of course under corresponding commission protection for the Party of the Second Part and prompt communication of the entire transaction to the Party of the Second Part.

Frank V. Paul, vice president of Adolphe Hurst & Co., Inc., in his direct testimony at the trial, described in detail the part played by his company in securing orders for aluminum foil for his company's principal in Germany. Whenever he found a purchaser in the market for aluminum foil he ascertained the quantity desired and the approximate price the buyer desired to pay. He then cabled the Breisgau-Walzwerke G. m. b. H. the name of the customer, the quantity desired, and asked for a quotation. The quoted price was then presented to the customer who accepted or rejected it. If, after negotiation, an agreement was reached, the order was cabled to Germany followed by a written confirmation by mail. The Breisgau-Walzwerke G. m. b. H. in turn addressed an acknowledgment of the order to the buyer and sent it through Adolphe Hurst & Co., Inc. These confirmations and acceptances from the manufacturer were the acceptances of the orders.

In some instances the purchaser in the United States paid the shipper in Germany directly, and in other instances payment was made through Adolphe Hurst & Co., Inc. Moreover, in some cases the

purchaser himself made customs entry and in other cases the entry was made by Adolphe Hurst & Co., Inc.

It thus appears that Breisgau-Walzwerke G. m. b. H. sold aluminum foil for export to the United States both with the assistance of Adolphe Hurst & Co., Inc., its agent, and by direct offers to buyers in the United States. The method is immaterial because in all cases the order was placed with the German manufacturer by whom it was accepted. The procedure was similar to that present in the case of *Robinson & Co. et al.* v. *United States,* 13 Ct. Cust. Appls. 644, T. D. 41486. There, the majority of orders were placed with the manufacturer's agent in New York, but some orders were placed directly with the manufacturer in Switzerland. Sales were made f. o. b. New York, duty paid. All merchandise was consigned to the manufacturer's agent in New York and billed by the consignee to the purchaser. All payments were made to the agent and title remained in the shipper until delivery to buyer.

Upon such facts the court held that where or when the title passed from the foreign seller to the purchaser had nothing to do with export value, and that the merchandise was dutiable upon the basis of export value.

After careful consideration I am convinced that the case of *United States* v. *Massce & Co. et al.,* 21 C. C. P. A. 54, T. D. 46379, cited by counsel for the Government in the brief filed herein, has no application to the present state of facts, for the following reasons:

1. Adolphe Hurst & Co., Inc., did not assume the credit risk when it acted as the selling agent of the manufacturer, although it acts as collector of the funds from which it extracts its commission and forwards the balance to the manufacturer.

2. The foreign manufacturer retains entire responsibility for quantity and delivery.

3. The foreign manufacturer must accept all orders and set all prices.

4. The foreign manufacturer retains the right to do business directly with American customers, although in such cases Adolphe Hurst & Co., Inc. is entitled to receive a commission on the business done in such manner.

5. All confirmations are made out in the name of the purchasers and forwarded to them through Adolphe Hurst & Co., Inc.

Hence, since it is established that the existence of the contract (exhibit 1) offers no bar to the ascertainment of an export value for the involved merchandise, let us now proceed to the question as to whether such export value may be determined from the record before us.

In his affidavit (exhibit 4) Eberhard Hentschel, assistant export manager of the shipper of the instant merchandise, states that alu-

minum foil of .00035-inch gauge was freely offered for sale and sold without any restrictions as to disposition at prices ranging from 48 to 50 cents per pound f. o. b. New York or Boston, duty paid; and at 36¾ cents per pound f. o. b. Hamburg; and attached to the affidavit are invoices at such prices in support of such statement.

In the same affidavit occurs the statement that the freely offered price to all purchasers for exportation to the United States of aluminum foil of .002-inch gauge is 44 cents per pound f. o. b. New York or Baltimore, duty paid; and attached to said affidavit are invoices at such prices.

It is to be noted that all of the above-named prices include the agent's selling commission or the cash discount where sales are made to the agent for his own account, neither of which items can be allowed as a nondutiable item.

Counsel for the Government contends that these prices cannot be considered for the reason that they are prices for unusually large quantities far in excess of the usual wholesale quantity. The only evidence in this record as to what constitutes the usual wholesale quantity is the statement in the affidavit of the manufacturer (collective exhibit 4) "that the usual wholesale quantity was 1,000 pounds." Attached to the affidavit, however, are copies of sales showing various quantities purchased. Therefore, the statement as to what constitutes a usual wholesale quantity is a mere conclusion and cannot be considered.

In the special agent's report (exhibit 15) under the heading "Usual Wholesale Quantity" it is stated that the quantity usually *delivered* varies from 3,000 to 20,000 pounds per shipment, which again is no evidence of what constitutes the usual wholesale quantity of the instant merchandise. Hence, the rule laid down by the appellate court in the case of *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093, must prevail, to wit, while the statement in an affidavit that a given quantity is or is not the usual wholesale quantity may under some circumstances be regarded as some evidence of the fact, such statement can have no weight as a statement of fact when all the facts upon which the statement is made are disclosed. It then becomes the conclusion of the witness, which can have no weight with the court in determining what is the usual wholesale quantity.

Moreover, an examination of the invoices of sales, orders, and confirmations in the record discloses that the prices evidently do not depend upon the quantity purchased, the price paid for a small quantity in one instance being less than the price paid for a much larger quantity. *Jenkins Brothers* v. *United States, supra.*

It is uncontradicted that the principal market for the sale of the merchandise at bar was at Singen—Hohentwiel, Germany.

In regard to the foil of .002 nch gauge, being the merchandise covered by reappraisement 128264–A, there does not appear to be much difficulty in determining from the record the proper export value thereof. This would seem to be the unit price of 44 cents per pound, f. o. b. New York, duty paid, from which should be deducted inland freight from the factory to Bremen, the port of exportation, ocean freight, and insurance and consular fee as shown by the invoice, the result to be divided by 1.40 for the deduction of the duty; which I hereby find to be the dutiable value.

In regard to the aluminum foil of .00035-inch gauge, being the merchandise covered by reappraisement 128263–A, the exact result is more difficult to obtain owing to the fact that the freely offered price *to all purchasers*, to wit, 36¾ cents per pound as given in the affidavit (exhibit 4), is f. o. b. Hamburg. (*United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. 290, T. D. 46817; *United States* v. *Mexican Products Co.*, C. A. D. 129). There is no evidence in the record of the charge for inland freight from the factory to Hamburg, except the statement in the affidavit (exhibit 4) that the difference between the price f. o. b. Hamburg and the price ex works is one-half cent per pound. Unfortunately, however, although the unit price is 36¾ cents per pound f. o. b. Hamburg, the bill of lading shows that the merchandise was actually shipped from Bremen.

In regard to the charge for inland freight from the factory to Bremen, the evidence is conflicting. In the report of Treasury attaché (exhibit 15) the charge for all f. o. b. expenses, including inland freight between the factory and Bremen, is given as 1.90 reichsmarks per 100 kilos, or the equivalent of approximately .004 cents per pound. On the other hand in the consumption entry the charge for inland freight from factory to Bremen is given as 3.10 reichsmarks per 100 kilos.

In view of this conflict in the evidence I am taking the amount of $33.39 given in the invoice as the proper charge for inland freight, since apparently that was the amount actually paid therefor.

Upon the entire record I find the following facts:

1. That the aluminum foil sold for home consumption in Germany is not similar to the aluminum foil there sold for export to the United States and of the character here imported.

2. That all sales of aluminum foil for home consumption in Germany are restricted to particular purchasers and also as to resale and use.

3. That there were in Germany unrestricted sales of such or similar merchandise to that here imported to countries other than the United States at prices as low or lower than the entered values herein.

And from such facts I conclude as matters of law:

1. That there is no foreign value for the imported merchandise, as such value is defined in section 402 (c) of the Tariff Act of 1930.

2. That there is in Germany an export value for said merchandise as hereinbefore found, to wit: For the aluminum foil of .002-inch gauge, covered by reappraisement 128264–A, 44 cents per pound f.o.b. New York, duty paid, from which should be deducted as nondutiable charges inland freight from factory to Bremen, ocean freight and insurance and consular fee as stated in the invoice, the result to be divided by 1.40 for deduction of duty; and for the aluminum foil of .00035-inch gauge, covered by reappraisement 128263–A, 36¾ cents per pound, less inland freight as invoiced.

Judgment will be rendered accordingly.