## WM. S. PITCAIRN CORP. *v.* UNITED STATES

**No. 5976.**—Invoices dated Birmingham, England, September 6, 1941.
Entered at New York, N. Y., October 10, 1941.
Entry Nos. 718987 and 718994.

(Decided January 14, 1944)

*Benjamin A. Levett* (*Benjamin A. Levett* and *Meyer Ohlbaum* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

KEEFE, Judge: This appeal for a reappraisement involves the value of certain chinaware and earthenware articles. At the trial the parties hereto agreed to the following statement of facts:

1. That the merchandise involved is earthenware and chinaware, consisting of tableware and so-called fancy articles exported from Birmingham, England, on September 16, 1941.

2. That the entered value of such merchandise is the export value thereof as defined in Sec. 402 (d) of the Tariff Act of 1930 as amended.

3. That the appraisement of said merchandise by the appraiser was made on the basis of the foreign value as defined in Sec. 402 (c) of the Tariff Act of 1930 as amended. It is not to be construed that the importer concedes the appraised value as being the foreign value under the statute for such or similar merchandise.

4. That 16⅔% or 33⅓% added to the entered value by the appraiser respectively in reappraisements 142112–A and 142113–A, are not applicable to the item of packing.

5. That at the time of exportation of such or similar merchandise to the United States such or similar merchandise was freely offered for sale for home consumption in Great Britain and for export to the United States to all purchasers in the principal market, the so-called "Staffordshire Pottery District," comprising among others the following cities and towns in England, namely, Burslem, Cobridge, Fenton, Hanley, Longport, Longton, Stoke-on-Trent, and Tunstall, in the usual wholesale quantities and in the ordinary course of trade.

6. That the price for home consumption or for export to the United States is not affected by the quantity sold.

7. The facts stipulated are expressly made exclusively for these two cases and no others and may not be considered as binding on either of the parties hereto as to any other pending case or cases that may arise on this subject matter, and this understanding is of the essence of this stipulation, it being understood that the facts here stipulated may not be construed as being stipulated in any subsequent case in which the record herein may be incorporated.

The evidence before me is entirely documentary. Exhibits 1 to 18 and exhibits 19 and 20 were offered and admitted without objection. These exhibits are as follows:

Exhibit 1 is a copy of the British Finance Act of 1940, including part V—"Purchase Tax." Exhibit 2 is the foregoing agreed statement of facts. Exhibit 3 is Notice No. 74 by the Commissioners of Customs and Excise of the British Government, explanatory of the purchase tax provisions. Exhibit 4 is an affidavit by the commercial manager of Doulton & Co., Ltd., the shippers of the instant merchandise. Exhibits 5 to 18, inclusive, are affidavits of other British firms in the Staffordshire Pottery District who sell such or similar merchandise for home consumption. Exhibit 20 is a certification of the British Information Bureau of a copy of "The Sale of Goods Act," 1893 (56 and 57 Vict. C. 71), part 1, sec. 1, par. 1. Exhibit 19, admitted in evidence on behalf of the Government, is a report of Robert C. Chalker, vice consul of the United States at Birmingham, England. Attached to this report are various affidavits including those of manufacturers in the Staffordshire Pottery District, together with copies of invoices; the British Finance Act of 1940; and Notice by the Commissioners of Customs and Excise, as follows: Notice No. 77, Notice No. 78, and Notice No. 79; Statutory Rules and Orders 1941 No. 700; and three price lists.

The parties hereto agreed that the advances of the appraiser in these cases were made by reason of the provisions of the British Finance (No. 2) Act of 1940, 3 and 4 Geo. 6, chapter 48, commonly referred to as the British purchase tax. Counsel for the Government conceded that the affidavits admitted in evidence on behalf of the plaintiff were from pottery manufacturers located in the so-called Staffordshire Pottery District, and that at the time of exportation of the imported merchandise the affiants manufactured and sold for home consumption chinaware or earthenware similar to the merchandise here involved, some of the concerns manufacturing only chinaware, and others earthenware exclusively. Government counsel further conceded that in case D (456) 116, reappraisement 142112–A, the order was accepted on March 27, 1941; and in case D (46) 108, reappraisement 142113–A, the order was accepted on March 28, 1941. These invoices are extracts from an invoice in another reappraisement numbered 146531–A, pending, but not before the court in this hearing, and the foregoing dates appear upon such invoice.

Upon the introduction of the foregoing documentary evidence the reappraisements were submitted for decision.

The merchandise in reappraisement 142112–A consists of earthen tableware. The invoice prices were subject to a plussage of 50 per centum, a discount of 2½ per centum, and the addition of the cask. The merchandise was entered as invoiced and appraised by adding thereto 16⅔ per centum to equal the foreign value. The merchandise covered by reappraisement 142113–A consists of ornamental figures composed of chinaware and also of earthenware. The unit invoice prices were subject to a plussage of 30 per centum, a discount of 2½ per centum and an addition for the cost of the hogshead. The appraiser increased the entered value by adding thereto 33⅓ per centum to equal foreign value.

The purchase tax law, part V, sec. 18, provides that "A tax, to be called a purchase tax, shall be charged   *   *   *   *   *   *   *   on the wholesale value of all chargeable goods bought under chargeable purchases." [Italics not quoted.] The wholesale value of any goods is defined in the law (part V, sec. 21) to be "the price which in the opinion of the Commissioners the goods would fetch, on a sale made at the time when the tax in respect of the goods becomes due by a person selling by wholesale in the open market in the United Kingdom to a retail trader, carrying on business in the United Kingdom only, if no tax were chargeable in respect of the sale and it were made in the circumstances specified in the Eighth Schedule to this Act." [Italics not quoted.] The law provides in the Eighth Schedule above referred to that in computing the price of goods sold at wholesale to a retail trader, it shall be assumed—

(a) that any commission or other costs, charges or expenses incidental to the making of the contract of sale are to be paid by the seller;

(b) that the price is to include the cost of delivery to the buyer at his place of business, and of insurance and other costs, charges and expenses incidental to such delivery;

(c) that the price is the sole consideration for the sale;

(d) that neither the seller nor any person associated in business with him has any interest, direct or indirect, in the subsequent re-sale or disposal of the goods; and

(e) that there has not been and will not be any commercial relationship between the seller and the buyer, whether created by contract or otherwise, other than that created by the sale.   [Italics not quoted.]

Chargeable goods consist of goods "falling within any of the classes specified in the first or second columns of the Seventh Schedule" of the purchase tax law and include earthenware and chinaware. See sec. 19, par. 1, of the act. Chargeable purchases are defined in sec. 18, par. 2, of the act as including the following:

(a) any purchase, made from a wholesale merchant or manufacturer   *   *   *   selling by wholesale, of goods which either—

(i) are in the United Kingdom at the time of the purchase, or

(ii) in the case of a purchase of unascertained goods, are in the United Kingdom at the time when the goods are appropriated to the purchase, or

(iii) having been imported into the United Kingdom are entered for home use by or on behalf of the seller under the purchase;

However, purchases made from an unregistered wholesale merchant and purchases made by a registered wholesale merchant as stock for his business, or by a registered manufacturer as materials, are exceptions from the foregoing definition. Notice No. 74 issued by the Commissioners discloses that whether a wholesale merchant is registerable or not depends on whether the persons to whom it sells in the regular course of trade are persons buying goods for the purpose of selling them again, or persons using such goods as materials in the manufacture of other goods. The commercial status of the firm as a wholesale merchant or the size of its business is immaterial.

From the foregoing it will be seen that the tax here in question is charged upon the basis of the price the goods would "fetch" on a sale made by a person selling "by wholesale" to a retail trader, such price "to include the cost of delivery to the buyer at his place of business, and of insurance and other costs, charges and expenses incidental to such delivery," if such transaction constitutes a chargeable purchase, that is, any purchase made from a wholesale merchant or manufacturer, who is required to be registered, and comes within the foregoing definition of wholesale merchant or manufacturer. If it does not constitute a chargeable purchase no tax is chargeable.

The purchase tax law further provides (sec. 22) as to the person responsible for the collection of the tax and making payment thereof to the Government, that the wholesale merchant or manufacturer from whom the purchase was made is responsible and such tax shall become due on the *delivery* of the goods under the purchase. Persons who are registered may freely buy and sell among themselves without regard to the tax. It is only when a sale is made to an unregistered person that the tax is applicable, or when sold to a registered person for his own consumption. When a registered person makes a purchase of chargeable goods as stock or as materials he is required to acquaint the seller that he is the holder of a certificate of registration and that he intends to sell the goods or to use them as materials and not otherwise. If any person falsely represents that he is a holder of a certificate, the amount of the tax which would be chargeable is recoverable from the person making such representation in like manner as if he had been accountable for it.

The law (sec. 27) requires a seller of chargeable goods under a chargeable purchase to add to any invoice delivered by him to the buyer a statement indicating the amount of tax for which "the seller may be accountable in respect of the purchase." Where goods have been bought before the effective date of the tax had been fixed or

before a change in rate has been made "the seller may, in the absence of agreement to the contrary, recover, as an addition to the consideration, a sum equal to the amount of the tax chargeable in respect of the goods, * * *." If, on the other hand, the goods were bought under a purchase made before the date on which approval was given to an order directing that the tax cease becoming chargeable to certain goods, or that a reduced rate be substituted, the buyer, in the absence of agreement to the contrary, may deduct from the consideration a sum equal to the amount of the tax providing the seller has had the benefit of the tax not becoming chargeable.

In the Commissioners' Notice numbered 79, enlarging upon the information contained in notice numbered 74, and issued for the guidance of registered traders in arriving at the proper tax value, the following appears:

(a) Generally speaking the price charged by a wholesaler to an independent retailer * * * adjusted * * * for cash discount and delivery expenses * * * will be accepted as a fair measure of the open market value.

(b) Where the same goods are being sold by a wholesaler to independent retailers * * *; and also (i) to retailers who are wholly or partly under the same financial or managerial control as the sellers, or (ii) by way of transfer to separate retail branches or departments of the seller's business, or (iii) to the public direct * * * the tax on such sales or transfers should be calculated on the prices at which the same goods are being sold to independent retailers.

(c) Where there are no sales of similar goods to independent retailers and the goods cannot therefore be taxed on the basis explained above, the tax should be calculated on the price which *would* be charged for the goods on a sale by a wholesaler to an independent retailer. If the seller considers that his present basis of invoicing reflects such a price, tax should for the present be charged on that basis, but he must be prepared in due course to justify it to the Commissioners as affording a fair open market wholesale value of the goods.

(d) Where the value on which tax should be charged cannot be arrived at as explained above, e. g., in the case of * * * traders making goods only for direct sale by retail to the public, the tax should be calculated on the retail selling price of the goods (excluding tax) less such a percentage deduction as will afford a fair open market wholesale selling price. * * *.

(e) It should be borne in mind that the price of a sale, although made in the open market to a party entirely independent of the seller, may not necessarily represent the statutory value. Examples of cases in which adjustment may be necessary are as follows:

(i) sales by registered manufacturers direct to retailers at the same level of price as to wholesalers;

(ii) sales to unregistered trade buyers at the same price as to registered wholesalers;

(iii) sales to registered persons not buying under their registration certificate, at prices below the wholesale/retail level;

(iv) sales at varying discounts according to the quantity purchased;

(v) sales to large consumer purchasers such as public authorities, institutions, etc., at prices lower than those normally given to retailers.

In such cases the registered seller should, in the absence of official direction, himself make the necessary addition to the invoice price to bring it to the required wholesale/retail level. As regards (i), (ii), and (iii), the amount of any increase

over the actual price charged which may be necessary to arrive at the tax value will vary with the circumstances of the case and generally speaking, the wholesale/retail margin will be known to the manufacturer (or other registered seller) or can be obtained from his Trade Association. As regards (iv) and (v), bona fide quantity and trade discounts which are freely available to all retailers at the time of purchase may, when actually allowed to the purchaser, be deducted from the gross price of the goods for the purpose of arriving at the value. But the quantity bought and the price charged or the discount allowed must be within the limits reasonably appropriate to purchases by retailers generally; it follows that quantity discounts or net prices given to large consumers or other buyers which represent terms lower than those given to the seller's ordinary retailer customers do not afford an adequate basis for charge of tax and require adjustment to the level of price allowed to such retailers.

A tax value less than the retailer's cash delivered buying price (including commission or other costs, charges or expenses incidental to the making of the contract of sale) may not be adopted without official approval.

\*     \*     \*     \*     \*     \*     \*

3. Delivery Expenses.—If goods are not sold at a price free delivered to the buyer's premises, the cost of delivery must be added to the price when calculating the tax value. \* \* \*.

Where \* \* \* owing to lack of information, or, for example, where goods are in practice collected by the buyer and an equitable basis cannot be framed, an overall addition of not less than 2½ percent, may be made to the price. Alternative proposals for arriving at a fair average delivery charge should be submitted in the first place to the local Officer of Customs and Excise.

The seller of the merchandise herein in an affidavit (exhibit 4) stated that merchandise of the same character is sold in Great Britain at the same prices shown in the invoices herein; that such goods under the finance act of 1940 when sold for home consumption became subject to a purchase tax which became due on delivery of the goods purchased; that when the tax is collectible by the seller the tax is noted at the foot of the invoice, but is never allocated to the individual items. The affidavits, exhibits 5 to 18, are quite similar to exhibit 4. Many of the invoices attached to the affidavits have 2½ per centum added to the total amount thereof for carriage, then a deduction of 2½ per centum for discount, and on such sum the tax is calculated, and added to the total amount of invoice. Some invoices have the 2½ per centum cash discount deducted from the total invoice price, and in others the deduction is only for tax purposes. Likewise some invoices show an addition of 2½ per centum for inland freight, while others have such addition made only for tax purposes. In exhibit 19 our vice consul reports that the tax is levied at the basic or other tax rate on the wholesaler's delivered price to the retailer and the last registered firm to handle the goods is held responsible for the amount of the tax. Such tax is chargeable at the appropriate rate in force at the time of the delivery of the goods. Among the

affidavits attached to his report is that of the Director of Hoods, Ltd., in which the following statement appears:

* * *. We collect the purchase tax from the retailers to whom we sell, and pay the amount to the tax authorities every three months. * * *.

The tax becomes due as of the date of the delivery of the goods to the retailer, and we are accountable to the tax authorities as from that date. * * *.

The vice consul pointed out that quantity discounts are not prohibited but the calculation of the purchase tax must be made before allowance thereof, and further that earthenware manufacturers sold a large proportion of their merchandise to wholesalers and that such sales were made without restriction. However the chinaware manufacturers sold very largely to retailers. To the wholesalers the manufacturers made offers in the usual wholesale quantities and in the ordinary course of trade without quota restrictions. An affidavit of the director of F. W. Woolworth & Co., Ltd., forwarded by the vice consul, states that the company is registered as retailers for purchase tax purposes, and the purchase tax is collected from the consumer public through the medium of the retail branches of the company; that the appropriate amount of the purchase tax for which the company is accountable to the Crown is included in the retail price charged to the consuming public, "but whether we collect tax from our customers or not, we are liable to the authorities for the tax concerned"; that the tax becomes due at the date of the appropriation of taxable goods for the retail trade which has been designated by the Commissioners as the "date of despatch from our supplier of goods bought Carriage Forward, and the date of receipt at our retail stores of goods bought Carriage Paid. We are accountable to the Crown for the amount of tax due on such goods as from that date. We remit to the tax authorities every three months the amount of tax due to them against invoices for that period."

The Commissioners' Notice numbered 77 in paragraph 25 states that "The tax on any taxable sales becomes due at the time when the goods are delivered, and it must be calculated at the rate then in force for the particular class of goods concerned." In the same notice (paragraph 56 (a)) it is provided that

When goods are damaged or destroyed on the premises of a registered firm (not being a separate retail branch or department thereof) no liability to tax will ordinarily arise on that account, if there has been no taxable sale or appropriation. The same applies where the damage or loss occurs while the goods are in transit to another registered firm who has bought them tax-free as stock or materials, or to an export ship if they have been consigned abroad.

The Commissioners' Notice numbered 79 discloses that the accountable person or firm will be required to pay the tax on all chargeable sales although the level of value on which the purchase tax is chargeable may be in excess of the price for which the goods are sold; that generally speaking the price used as a determinative of the tax

is the price charged by a wholesaler to an independent retailer, adjusted for cash discount and delivery expenses, and would be accepted as a fair measure of value in the open market. Where registered sellers make sales below the wholesale/retail level, the tax must be figured upon the basis of the wholesale/retail level; that if goods are not sold at a price free delivered to the buyer's premises, the cost of delivery must be added to the price when calculating the tax value; and where goods are, in practice, collected by the buyer and an equitable basis cannot be framed, an over-all addition of not less than 2½ per centum may be made to the price.

Counsel for the plaintiff contends, first, that the additions made by the appraiser to equal the tax are unlawful because such tax is not part of the freely offered price, and, in view of the British tax law, it cannot become an element of foreign value as defined in section 402 (c) of the Tariff Act of 1930. Second, the tax in question is a purchase tax and not a sales tax, and therefore it is not part of the sales price of the merchandise. Third, the tax is not a part of the value of the merchandise because under the provisions of the British purchase tax law the tax cannot possibly apply at the time the merchandise is offered for sale or sold in the principal market. In his brief counsel for the plaintiff states the question before us to be as follows:

* * *. The question thus resolves itself into an inquiry as to whether an uncertain and variable tax that is not mentioned when goods are offered for sale or ordered, that does not become due until the goods are actually delivered to a customer, *some time after the offer is made and the order placed,* which may be different at that time or eliminated altogether, and the amount of which is uncertain until delivery is made, in most cases at some place other than the principal market, can be considered as part of the freely offered price *in* the principal market *on some earlier date,* particularly when the tax is one with which the seller in many cases does not collect at all, and in no case has any concern except to collect it and transmit *in toto* to his government. [Plaintiff's brief, page 36.]

The Government contends that the amount of the tax on the selling price of such or similar merchandise, when sold in the principal market by the manufacturer to an "unregistered" purchaser is a part of the dutiable foreign value as defined in section 402 (c). To sustain such contention it is argued that the foreign value must be determined on the basis of the sales to "unregistered" purchasers, and that when such or similar merchandise was freely offered for sale for home consumption to such purchasers the British purchase tax was included as part of the price paid for the goods. Counsel for the Government maintains that:

* * * * * * *

It is only necessary to determine the price at which such or similar merchandise was freely offered for sale and sold to all purchasers for home consumption in

England in order to determine the foreign value as defined in section 402 (c) of said act as amended, so that the higher of the two values may be taken for dutiable purposes as required by section 402 (a) (1) of said act. [Government brief, page 5.]

Section 402 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, provides as follows:

SEC. 402. VALUE.

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

\*        \*        \*        \*        \*        \*        \*

(c) FOREIGN VALUE.—The *foreign value* of imported merchandise *shall be the market value or the price* at the time of exportation of such merchandise to the United States, *at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade,* including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\*        \*        \*        \*        \*        \*        \*

[Italics not quoted.]

Section 402 has been interpreted by many decisions of the courts so that there is no obscurity as to the meaning of the terms thereof. In *American Shipping Co.* v. *United States*, 29 C. C. P. A. 250, C. A. D. 198, it was contended by the appellant that the term "trade" in the phrase "freely offered for sale to all purchasers    \*    \*    \*    in the ordinary course of trade," referred to "freely offered sales prices in the ordinary course of business to persons who deal in the commodity in question for a profit." The court, however, held that the price Congress intended to be accepted as a basis of foreign value was the price freely offered to all and not offered to a privileged few regardless of the status of the few.

In *United States* v. *Faber*, 21 C. C. P. A. 290, T. D. 46817, the court stated that the law was explicit in providing that the foreign value of imported merchandise shall be the market value or the price at the time of exportation to the United States at which such or similar merchandise is *freely offered* for sale *to all purchasers* in the principal markets of the country from which exported, plus other elements specified in section 402 (c). The term "all purchasers" was emphasized in the case of *United States* v. *American Glanzstoff Corp.,* 24 C. C. P. A. 35, T. D. 48308, where the court stated:

\*    \*    \*. The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but *it does mean all of those who cared to buy such goods in such markets.* [Italics not quoted.]

Our appellate court again stressed the all-inclusiveness of the term "to all purchasers" in the case of *United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80, C. A. D. 129, where it stated that "In deter-

mining foreign and export values, as defined in section 402 (c) and (d), respectively, it is proper to consider only the market values or prices at which merchandise like or similar to that imported is freely offered for sale *to all purchasers* (not to the greater number, or to those of a particular class) in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade."

In *Robinson* v. *United States*, 13 Ct. Cust. Appls. 644, T. D. 41486, the court discussed the emergency tariff act, section 302, providing that the "price * * * at which such or similar merchandise is sold or freely offered for sale to all purchasers * * *" and stated that the provision makes mere offers for sale just as effective in making export value as sales actually made and concluded. The court there stated:

If Congress intended that only sales passing title should be determinative of export value, it would have defined export value as the price at which merchandise was *sold* for export to the United States and left out of the "equation" the price at which such merchandise was freely offered for sale to all purchasers.

In *Redfern* v. *United States*, 17 C. C. P. A. 117, T. D. 43453, the court noted that the word "sold" was left out of the definition of "value" when the Tariff Act of 1922 was written. The merchandise in that case was of such nature that it was made exclusively for the American market. However, the affidavit of shipper stated that identical merchandise was being freely offered for sale to all wholesale dealers in Great Britain and 12 copies of such offers were attached. However, there had been no acceptances and no sales of such merchandise in Great Britain. The court below had stated that "Where no actual sale of merchandise has ever been made in a foreign country it can not be said that there is in that country a market for such merchandise." In commenting upon the foregoing statement our appellate court stated:

This statement may be intended to convey the thought that there could be no *ordinary course of trade* unless there were actual sales, or that, unless there were actual sales, there could be no *principal market* for this or similar merchandise, or that, without sales, there could be no usual wholesale quantities.

* * * * * * *

As we view the issue at hand, it is not necessary for us, upon this record, to decide the question as to whether or not there must be sales of such or similar merchandise shown in order to establish that there was a free offering for sale of the same to all purchasers in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade, and we do not decide that question. * * *.

In the case of *United States* v. *Zellerbach Paper Co.*, 28 C. C. P. A. 303, C. A. D. 159, the court stated the duties of the appraiser in appraisement to be as follows:

It must first be observed that the statute requires that in determining foreign value of imported merchandise the appraiser is required to find "the market

value or the price * * * at which such or similar merchandise is freely offered for sale to all purchasers * * * in the ordinary course of trade." It is clear that Congress contemplated that if there was a foreign value for merchandise imported into this country, it had to be "the price" for which such or similar merchandise was freely offered for sale and not several different *prices*.

As I view the situation before me here, the price at which such or similar merchandise is freely offered for sale for home consumption to *all* purchasers in the principal markets from which the merchandise was exported in the usual wholesale quantities and in the ordinary course of trade cannot possibly be brought within the narrow limits of the definition of wholesale value under the purchase tax law, heretofore set out. The price freely offered to all purchasers in the home market, in the usual wholesale quantities and in the ordinary course of trade, is the price held out in the trade price lists to all purchasers, wholesalers, and retailers alike. Such price did not include any tax designed to attach to the article at some future time. The price, as defined by section 402 (c), *supra*, may not be so limited as to include only such as is received by a person selling to a retail trader under a purchase shown to be a chargeable one, and for merchandise shown to have been delivered. Such conditions must exist before the tax in question attaches to the price. The price, upon which the tax is paid, is essentially c. i. f. and the tax is levied upon the final stage of wholesale transactions, and not then until the goods are in the possession of the retailer. Consequently the tax is not included in the freely offered price as indicated by the various price lists.

In the various outstanding tax cases the question whether or not the tax was a part of the value of the merchandise rested upon the nature and time the tax attached to the article. In *Fawcett* v. *United States*, 27 C. C. P. A. 372, C. A. D. 113, a tax levied in the foreign country upon the sale of flax yarn was added by the appraiser as a part of the foreign value. The tax was a manufacturer's 13 per centum sales tax, known as a "pauschal" (lump sum) tax, and was assessed when manufactured goods were sold in the markets of Czechoslovakia. The law, however, provided for a refund of the tax when yarn was woven into cloth or other manufactured articles. Such manufactured articles, when sold in the markets of Czechoslovakia, were subject to a sales tax of 6½ per centum. The manufacturer, after collecting the tax from the purchaser, paid it to the local tax collector and received a receipt therefor which he turned over to his purchaser. The purchaser, after manufacturing the yarn, was required to pay 6½ per centum tax on the selling price of the article, but in payment thereof was allowed to deduct the credit tax receipt he had received from the manufacturer, even though the yarns were not the identical yarns upon which the 13 per centum tax was paid. The 13 per centum tax was found to be an interim

tax which could be refunded upon the payment of the 6½ per centum tax on manufactured articles which the Government had found difficult to collect. In finding that the tax was not a part of the foreign value, the appellate court announced the following rule:

* * * where a tax of the exporting Government is levied upon the manufacture or sale of an article and is refunded upon export, said tax forms no part of the export value and we know of no decision (certainly none has been cited) which holds that a tax levied upon the sale of such article in such country for home consumption but which is refunded should form a part of the foreign value. The reason would seem to be clear. The tax so refunded would never enter into the value of the *goods* at any time.

In *Reisinger* v. *United States*, 20 C. C. P. A. 67, T. D. 45683, a tax levied upon illuminants "destined for consumption in Germany * * * amounting to 20 per centum of the selling price" was found to have accrued at the time the manufacturer sold it; that his wholesale price included it; and that purchasers buying in wholesale quantities paid a price covering the tax. Before the appellate court, it was contended that the tax attached after title had been acquired by the purchaser, and consequently it was not such a tax as becomes a part of the foreign value. The court, however, was of the opinion that so far as the German Government was concerned its collection was enforced at the source of that particular sale "which introduces the merchandise into the open market," and that the seller was liable and the tax was actually collected by the Government from such seller, who, in the ordinary course of trade, collected it from the purchaser. The appellate court held "* * * the German tax under examination was clearly intended to become, and did become, a part of the value or price at which the merchandise was—'freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade'."

In *Roger & Gallet* v. *United States*, 12 Ct. Cust. Appls. 201, T. D. 40181, the tax involved was levied by the French Government upon the alcohol content of perfumes, to wit, 10 francs per liter upon the alcohol contained in perfumery sold and consumed in France. There the tax became due when the alcohol was purchased by the manufacturer of the perfumery. It was held to be a part of the price.

In *Veolay* v. *United States*, 23 C. C. P. A. 101, T. D. 47766, a 12 per centum luxury tax was based upon the retail sales price, the inscription of which price was required on the labels in legible characters. It was stipulated in the law that the package containing the products subject to tax may not be put into commerce or offered for sale or sold without having affixed stamps forming seals and showing the payment of the tax, and were affixed by the manufacturers before the merchandise left the factory, or by importers before any circula-

tion in French territory, or at the latest before leaving storage. The trial court held (T. D. 45049) that the manufacturer alone was responsible for the tax and that it was a part of the value of the merchandise. Upon appeal to the division, it was held (Reap. Dec. 3417), that there was little doubt that the tax was upon the manufacturer or wholesaler except when put in storage under a lien of "acquit-a-caution." The division was of the opinion that the time of collection of the tax money was not of any great consequence in respect to the accruing of the tax, and it was held that as the tax plainly accrued when the merchandise left the factory of the manufacturer, it became a part of the wholesale value of the merchandise at that time and all commercial transactions thereafter involving the merchandise are necessarily subject to the lien of the 12 per centum luxury tax.

Upon appeal to our appellate court, it was held the tax stamps were required to be attached to the bottles containing the perfumery before permitting the products to be "put into commerce to be offered for sale or sold," and in cases where stamps were not used the tax had accrued before they were put in commerce and there was a fixed liability upon the manufacturer for its payment. As for the tax being placed upon the basis of the retail selling price, the court held that it is not the standard which is of importance, but the matter of payment, as the Government could use any standard it desired.

In *United States* v. *Allenby*, 20 C. C. P. A. 80, T. D. 45703, certain Japanese piece goods were entered at the export prices. As set out by our appellate court the merchandise was appraised at foreign prices which included a textile tax of 10 per centum imposed by the Government of Japan on textiles sold for consumption in Japan and the particular textiles there imported were not sold in the markets of Japan for home-consumption purposes and rarely were used by the Japanese people. However, such textiles had been continuously bought and sold in the home market without the inclusion of the tax for the sole purpose of manufacturing into articles to be exported. The pertinent portion of the Japanese consumption-tax law is set out in the decision of our appellate court. Therein it is noted that in certain circumstances the tax was remitted. I quote such portion thereof as follows:

ART. 3. Subject to the provisions of ordinance, consumption tax is remitted for the following:

1. Textiles for export to a foreign country or textiles which are to be exported to a foreign country after being made into manufactured goods.

\* \* \* \* \* \* \*

ART. 12. Every person intending to manufacture or sell textiles shall declare such intention to the Government; *but this does not apply when he intends exclusively to manufacture textiles coming* under the provisions of art. 3, par. 1 (2).

[Italics quoted.]

The lower court found that there were no foreign values and that the merchandise was dutiable at the export values. Upon appeal the appellate division of the court held that there were no foreign values on the dates of exportation; that its dutiable values were the export or entered values, and accordingly affirmed the judgment of the trial court. In affirming the judgment below the appellate court found that the tax "accrued," and was collected only in the event the merchandise was sold at retail to a Japanese resident, and that such was the accepted construction placed upon the law by Japanese revenue officers under whose supervision it was administered. The court further found that the export silk piece goods were freely offered for sale in the home market at prices exclusive of the textile-consumption tax, and therefore the entered value equaled the foreign value as well as the export value.

In *United States* v. *Passavant*, 169 U. S. 16, the German duty there in question was levied by the German tariff upon goods when consumed in Germany. It was collected when the finished product goes into consumption in Germany, but remitted when sold in bond for exportation. The Supreme Court stated:

> What was to be ascertained was the actual market value or wholesale price of the merchandise as bought and sold in usual wholesale quantities at the time of exportation, in the principal markets of the country from whence imported. This market value or price was the price in Germany and not the price after leaving that country, and the act does not contemplate two prices or two market values.
>
> The certificate of facts states that the German duty is imposed on merchandise when "sold by the manufacturers thereof for consumption or sale in the markets of Germany"; and "is collected when the finished product goes into consumption in Germany." *As the tax accrues when the manufacturer sells, his wholesale price includes it,* and the purchaser who buys these cotton velvets in wholesale quantities in the German markets pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets. [Italics not quoted.]

In all of the tax cases drawn to my attention the tax has been held to be a part of the value of the goods when it has attached as a part thereof before entering the trade and commerce of the country. That is not the situation here. The purchase tax attaches to the goods when they come into the hands of the retailer for distribution to the public. Prior to that time the goods may be freely traded between registered wholesalers and jobbers with no mention of the tax. In fact, trading in the goods between the registered sellers and unregistered retailers is restricted by the Government through the placing thereon of quantity quotas. Therefore unregistered retailers may not freely buy, nor may registered wholesalers freely sell to retailers. If goods are lost or destroyed before reaching the premises of the retailer, no tax is ever paid thereon by the registered seller or by the retailer.

Inasmuch as the tax does not accrue until the goods have reached the premises of the retail trader, and as the merchandise under consideration is freely offered for sale to all comers at the list prices, less a 2½ per centum cash discount, irrespective of any tax later accruing, except as such free offer is restricted as to quantities to retailers, I find that the export value of the merchandise is the same as the foreign value thereof and that such values are represented by the entered values of the merchandise here before me.

Judgment will be entered accordingly.