COX & FAHNER (STEEL UNION SHEET PILING, INC.) ET AL.
*v.* UNITED STATES

**No. 6232.**—Invoices dated Dusseldorf, Germany, June 16, 1937, etc.
Certified June 17, 1937, etc.
Entered at New York, N. Y., June 30, 1937; New Orleans, La., April 27, 1938, etc.
Entry Nos. 896373, 3493, etc.

(Decided November 15, 1945)

*Eugene R. Pickrell* for the plaintiffs.

*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett, Richard F. Weeks*, and *Daniel I. Auster*, special attorneys), for the defendant.

TILSON, Judge: The three appeals for reappraisement listed in schedule A, hereto attached and made a part hereof, involve the proper dutiable value of certain imported merchandise described as steel rounds, steel flats, and steel squares which, as I understand, are known as steel bars. Counsel for the plaintiffs abandoned the appeals as to all merchandise other than as set out above. The merchandise was appraised on the basis of foreign value at 115 reichsmarks per 1,000 kilos, less 3 per centum cash discount. Counsel for the plaintiffs claims that the steel bars sold for home consumption in Germany are not similar to those here involved; that the foreign market is restricted as to resales, and that, therefore, there is no foreign market value for this merchandise, as defined in section 402 (c) of the Tariff Act of 1930.

Counsel for the plaintiffs affirmatively claims that the proper basis for determining the dutiable value of this merchandise is export value and insists that the export value is the entered value. Counsel also contends in the alternative that the proper basis for finding value is the United States value, and insists that the proof offered is sufficient to establish the same.

These appeals were originally submitted before Dallinger, Judge, who did, on June 22, 1942, issue a so-called order, in which he found that no foreign, export, or United States value existed for this merchandise, and directed "* * * that within appeals be restored to the docket for the purpose of giving the plaintiffs herein an opportunity to prove the cost of production of said merchandise."

From the order of Judge Dallinger both parties filed applications for review before the Appellate Division of this court. The Appellate Division dismissed both applications for review, and from its action in so doing, the plaintiffs took an appeal to the Court of Customs and Patent Appeals. The appellate court affirmed the action of the Appellate Division of this court, holding in effect that the order of Judge Dallinger was nothing more than an interlocutory order which was not appealable.

These appeals were resubmitted upon the record as originally made, without the introduction of any further evidence in support of any of the claimed values, and are now before me by reason of Judge Lawrence having disqualified himself because of the fact that he was Acting Assistant Attorney General in charge of customs during, at least, a part of the time this litigation was in progress.

The record establishes that during the period here in question, 1937, 1938, and 1939, no such or similar steel bars to those here in question were freely offered or sold in the home market, and also that the market in Germany for steel bars was restricted as to resale. Upon these facts, I find that there was no foreign value for the merchandise.

On the question of whether or not the plaintiff had established an export value for the merchandise, Dallinger, J., in his order restoring the case to the docket, published as Reap. Dec. 5665, made the following observations:

The next question to be considered is whether there existed an export value for said merchandise, as claimed by the plaintiffs. In this connection counsel for the Government contends that no export value existed for the reason that due to the German syndicate's control of prices, steel bars were not freely offered to all purchasers for exportation to the United States. It is true that there was an "International Raw Steel Cartel," but according to the report of the Treasury representative, Karl M. Richards (defendant's exhibit 40), the said cartel included Belgium, France, Germany, Luxemburg, England, Poland, and Czechoslovakia. In other words, this so-called international syndicate was only an international European syndicate. To be sure, the plaintiffs' witness Barreau did testify on cross-examination that it was his "impression" that there existed

a United States syndicate for export business.    But a witness' impression cannot be accepted as evidence of the fact.

In its 1935 sales agreement (exhibit 1) the "Stahlunion-Export G. m. b. H.," the foreign seller and exporter herein, inserted in section III a proviso requiring its permission for export from the United States to other countries.    The 1936 agreement between the exporter and importer (exhibit 20) does not contain such a proviso.    Moreover, it appears that such a restriction was not in force on the dates of exportation herein, because paragraph 6 of article 35 explicitly states that there was no restriction of sales of such steel bars exported to the United States.

Counsel for the Government also raises the point that during the years 1937, 1938, and 1939, the export periods involved herein, the foreign exporter herein sold German steel bars for exportation to the United States to three territorial distributors only, to wit, Steel Union Sheet Piling, Inc., the importer herein, Steel Union, Inc., of Los Angeles, Calif., and Cron & Dehn of Seattle, Wash., and that therefore there existed no freely offered price to all purchasers for export to the United States, citing the case of United States v. Malhame & Co., 24 C. C. P. A. 448, T. D. 48911.

It is to be noted, however, that the sales agreement with each of those concerns covers a variety of steel products, each agreement expressly reserving the right of direct sale by the foreign exporter, sales of a number of said products being made to other purchasers.

Furthermore, paragraph 6 of exhibit 35 expressly declares that such or similar steel bars to those involved herein were freely offered for all purposes [to all purchasers] for export to the United States without any restrictions as to resale. For this reason I am of the opinion that the case of United States v. Malhame & Co., supra, has no application to the facts established herein.

For the above reasons I am satisfied that at the time of the exportation of the instant merchandise there was no restriction on the sale of such or similar merchandise for export to the United States.

It being established that there existed no foreign value for said merchandise, and also that there was no restriction on the sale thereof for export to the United States, the question arises as to whether on the evidence submitted I can find an export value therefor, as claimed by the plaintiffs.

While it is stated in the affidavit of Adolph Schmidt (plaintiffs' collective exhibit 35) that such or similar merchandise was freely offered for sale to all purchasers for export to the United States at certain specified base prices, plus certain extra amounts varying according to the thickness of the steel bars in question, nevertheless the prices set forth in the invoices attached to the said affidavit do not agree with such statements made in the affidavit.    As a matter of fact, there appears to have been no uniformity in the prices paid for said merchandise.    In one instance, the same importer paid three different prices for the same merchandise on the same day.   · This may be accounted for by the fact that the merchandise herein was all manufactured to order, a considerable interval of time elapsing between the offer, the giving of the order, and the actual exportation of the merchandise in question.    Hence, the exporting manufacturer in making his offer for future deliveries was obliged to estimate both the inland and ocean freight in order to arrive at the actual C. & F. New York price.    Under these circumstances it may readily be seen that the actual freight paid at the time of exportation would naturally differ considerably from the exporter's estimate.

While, as one member of this court, I would be inclined to give great weight to the statements in the affidavit of Adolph Schmidt (plaintiffs' collective exhibit 35) as to the existence of an export value for the merchandise herein, nevertheless the United States Court of Customs and Patent Appeals has decided otherwise.

In the case of *Jenkins Brothers* v. *United States*, 25 C. C. P. A. 90, T. D. 49093, the appellate court said:

> * * *. While a statement that a given quantity is or is not a usual wholesale quantity might in some circumstances be regarded as some substantial evidence of the fact, such a statement can have no weight as a statement of fact when all of the facts upon which the statement is made are disclosed. It then becomes merely a conclusion of the witness, which can have no weight with the court in determining what is a usual wholesale quantity.

In the instant case the invoices attached to said collective exhibit 35 do not agree with the statements in the affidavit, and therefore I am unable to find upon the evidence herein that there was a definite price at which such or similar merchandise was freely offered for sale at the time of the exportation of the merchandise herein to all purchasers in the usual wholesale quantity in the principal markets of the country of exportation in the ordinary course of trade for exportation to the United States.

I am in complete accord with the observations and findings of Judge Dallinger, as set out above, down to the point where he quotes from the *Jenkins* case and concludes therefrom that the Court of Customs and Patent Appeals has precluded him from giving weight to the affidavit of Adolph Schmidt because the invoices attached to said collective exhibit 35 do not agree with the statements in the affidavit, and that therefore he was unable to find upon the evidence herein that there was a definite price at which such or similar merchandise was freely offered for sale.

In the *Jenkins* case, *supra*, our appellate court was promulgating a rule to be followed in finding a usual wholesale quantity, which is one of the elements to be established in finding a value for imported merchandise. The rule laid down in the *Jenkins* case, *supra*, for finding a usual wholesale quantity is merely this and nothing more and there is nothing in the *Jenkins* case which indicates that this rule was to be applied in finding any of the other elements of value.

On the other hand, if the invoices attached to collective exhibit 35 were competent to be considered by me, the mere fact that said invoices did not establish a *definite price* for the merchandise would not *ipso facto* preclude me from considering said invoices in finding a value for this merchandise. In finding the quantity which constitutes a usual wholesale quantity, we need only find the wholesale quantity in which the major portion of sales are made in the ordinary course of trade in the principal market of the exporting country, while in finding the value of imported merchandise we must determine the price at which *all* purchasers could buy, in the usual wholesale quantity and in the ordinary course of trade. This principle was very clearly stated in *United States* v. *Faber*, 21 C. C. P. A. 290, as follows:

> The law is explicit that foreign value of imported merchandise shall be the market value or the price at the time of exportation to the United States at which

such or similar merchandise is freely offered for sale to *all* purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, plus other elements specified in section 402 (c), *supra*.

How can it be said that the merchandise in the case at bar was freely offered to *all* purchasers in the usual wholesale quantities and in the ordinary course of trade at a discount of 5 per centum from the list price of the merchandise when, as found by the trial court, only a part of such purchasers in the usual wholesale quantities and in the ordinary course of trade were offered such discount, viz, those who would agree to purchases aggregating in value a specified minimum amount per year? It is clear to us that section 402 (c) does not permit the allowance of the 5 per centum discount here involved under the facts found by the lower court.

It is true that the appellate division of the Customs Court found that a majority of the sales made by the manufacturer were to firms entitled to the 5 per centum discount, but that is only saying that a *majority* of those purchasing in the usual wholesale quantities and in the ordinary course of trade, received said discount, while, to conform to the statute defining foreign value, the discount must be offered to *all* purchasers in the usual wholesale quantities and in the ordinary course of trade.

It is also true that we have held that, in determining what are *usual* wholesale quantities, the major portion of the sales or offers for sale in wholesale quantities should be the criterion, but it does not follow from that fact that a discount from list or invoice prices should be allowed in arriving at foreign value if it is shown that only a majority of the purchasers in the usual wholesale quantities, and in the usual course of trade, receive such discount. The statute reads *all* purchasers, not a majority of the purchasers. *United States v. Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216; *United States v. A. S. Neuberger and American Glanzstoff Corp.*, 19 C. C. P. A. (Customs) 96, T. D. 45241.

We regret that we find it necessary to reverse the appellate division in this case when, in arriving at its decision, it properly followed and was guided by a decision of this court. We reverse it only because we now disapprove the holding of this court in the case of *United States v. Hammel, Riglander & Co., supra*, insofar as it holds that a discount not allowed to all purchasers in the usual wholesale quantities, and in the ordinary course of trade, may be considered in arriving at either foreign or export value of imported merchandise.

The price at which *all* purchasers could buy is the highest price at which the merchandise is freely offered for sale in the usual wholesale quantities and in the ordinary course of trade in the principal markets of the country from which the merchandise was exported. Therefore, the fact that the merchandise might have been offered at different prices on the same day would not preclude the court from using the evidence of such offers in finding a value for the merchandise. The record shows that all of the instant merchandise was manufactured to order, that is, when the order for the merchandise was given and the sale consummated none of the merchandise was in existence but had to be manufactured thereafter. It appears to be the rule rather than the exception that the merchandise was not exported for from 4 to 12 months after the sale had been completed. Under such circumstances, of course, the value of said merchandise must be determined as of the

date of exportation rather than as of the date of sale. This finds confirmation in the following quotation from *White Lamb Finlay, Inc.* v. *United States*, 29 C. C. P. A. 199:

* * * the rule obtains that free *offers* of merchandise for future delivery establish a market price if the delivery can be prompt, and the ability of sellers to make prompt delivery of such merchandise under the September 20 offer is not negatived by the stipulated fact that there had been no deliveries of merchandise so offered on or prior to October 25, 1939; for, as hereinbefore stated, there might have been deliveries after October 25, or ability to make deliveries on or before or after October 25, in fulfillment of orders placed prior thereto, which would have been prompt deliveries under the September 20, 1939, offer.

Therefore, we are of the opinion that upon the stipulation before us the September 20, 1939, offer of 6 Belgian francs per meter, packed, less 3 per centum, for merchandise such as is here involved, is substantial evidence of the export value of the involved merchandise. * * *

The record shows that from "one ton per size and up" of this merchandise constituted a usual wholesale quantity and that Dusseldorf, Germany, was the principal market for the sale thereof.

Returning now to collective exhibit 35, the affiant therein states that from January 1, 1937, to November 25, 1939, he was manager of Stahlunion-Export, G. m. b. H., the exporter herein, and supervised all the sales of steel bars, steel rounds, and steel flats by the exporter herein for export to foreign countries; that during said time steel bars, steel rounds, and steel flats, the same as the steel products covered by the sales to the plaintiffs herein, were freely offered to all purchasers for export to the United States by Stahlunion-Export, G. m. b. H. without any restrictions as to disposition at the following prices ex works Germany:

| | |
|---|---|
| January 1937 to September 1937 | $1.20 per 100 lbs ex mills, |
| October 1937 to August 1938 | $1.42 per 100 lbs ex mills, |
| September 1938 to September 1939 | $1.22 per 100 lbs ex mills, |

plus the following extras:

*Steel rounds and squares:*

| | |
|---|---|
| ³⁄₁₆ inch thick | 32 cts per 100 lbs |
| ¼ inch thick | 22 cts per 100 lbs |
| ⁵⁄₁₆ inch thick | 16½ cts per 100 lbs |
| ⅜ inch thick | 11 cts per 100 lbs |
| ½ inch thick | 5½ cts per 100 lbs |
| ⅝ to 3½ inches thick | no extra |
| 3⁹⁄₁₆ to 6 inches thick | 6½ cts per 100 lbs |

*Steel flats:*

* * * * * * *

| | |
|---|---|
| 5 to 6 inches wide by ½ to less than 1 inch thick | 6½ cts per 100 lbs |
| 1½ to 6 inches wide by 1 to 1½ inches thick | 5½ cts per 100 lbs |
| 1½ to 6 inches wide by over 1½ to 2 inches thick | 11 cts per 100 lbs |

(7) That from January 1st, 1937 to the date of the signing of this affidavit [November 25, 1939], 119 sales were made of steel bars, steel rounds and steel

flats, the same as the steel products covered by the sales listed in Paragraph 5, by Stahlunion-Export G. m. b. H. for export to the United States;

(8) That the following is a list of sales of steel bars, steel rounds and steel flats for export to the United States by Stahlunion-Export G. m. b. H. during the period from January 1st 1937 to the date of the signing of this affidavit [November 25, 1939], which are representative of the sales by that concern of these commodities for export to the United States during that period:

Then follows a list giving the name of the purchaser, the date of sale, consular invoice number, date of certification of consular invoice, description of the merchandise, and what is stated to be "Ex Works Unit Prices of Merchandise," but which in fact appears to be total invoice prices or values.

Affiant further states in said collective exhibit 35:

That the prices at which steel bars, steel rounds and steel flats, similar to the steel bars, steel rounds and steel flats covered by the consular invoices listed in Paragraph 5 were freely offered for export to the United States during the period from January 1st, 1937 to the date of the signing of this affidavit [November 25, 1939] by concerns other than the Stahlunion-Export G. m. b. H., were in no cases higher than the prices as set forth in the consular invoices covered by Paragraph 5;

An examination of the invoices attached to said collective exhibit 35 shows that the merchandise was invoiced at various prices ranging from $1.24 per 100 pounds to $1.985 per 100 pounds, but it is also noted that each of these invoices shows either C. & F. or C. I. F. prices, which means that there is included in the prices shown on each of these invoices either an item of freight or items of freight and insurance from Antwerp, Bremen, or Rotterdam to New York, N. Y.; Baltimore, Md.; Savannah, Ga.; New Orleans, La.; Houston, Tex.; Mobile, Ala.; Los Angeles, Calif.; San Diego, Calif.; Oakland, Calif.; San Francisco, Calif.; and Seattle, Wash. There is nothing on these invoices, nor elsewhere in the record, to indicate the amount of either the freight or the freight and insurance which is included in the invoice prices, whether 10 cents per 100 pounds or $1.00 per 100 pounds. In the condition in which they appear in this record, these invoices are absolutely meaningless insofar as it might be contended that they show values for the merchandise covered thereby.

If I were able to determine the values of the merchandise represented by these invoices, then I would be able to determine whether such values tended to support the values given by the affiant in said collective exhibit 35, or whether such values tended to refute the statement of the affiant in said collective exhibit 35 as to the prices at which he states the merchandise was freely offered for sale. Since these invoices fail to show any values for the merchandise covered thereby, it cannot be said that they either support or contradict the statement of the affiant in said collective exhibit 35 as to the prices at which the merchandise was freely offered for sale. And unless there be other evidence in the record which overcomes the weight to

be given to the statements contained in said collective exhibit 35, such evidence is sufficient to establish export values for the instant merchandise.

In the case of *Robinson* v. *United States*, 13 Ct. Cust. Appls. 644, T. D. 41486, our appellate court held that mere offers for sale, if made to all desiring to purchase, were just as effective in establishing export value as sales actually made and concluded, using the following language:

If that section had provided that export value was the price at which mer-chandise was *sold* to all purchasers in the principal markets of the country from which exported, there might be some ground for saying that the appraisement was not made in accordance with law. Section 302 does not so provide, however, and clearly contemplates not only actual sales, but offers for sale freely made to all purchasers for export to the United States. Under the emergency tariff act mere offers for sale if made to all persons desiring to purchase goods for export to the United States were just as effective in making export value as sales actually made and concluded. * * *

If Congress intended that only sales passing title should be determinative of export value, it would have defined export value as the price at which merchandise was *sold* for export to the United States and left out of the "equation" the price at which such merchandise was freely offered for sale to all purchasers. * * *

See also *Oceanic Trading Co.* v. *United States*, 21 C. C. P. A. 146; *United States* v. *T. E. Ash*, 22 C. C. P. A. 395, and *United States* v. *Baldwin Universal Co.*, 18 C. C. P. A. 394. In the latter case, it is stated that:

* * * It is perfectly true that in any given case the facts may be such as to require evidence of sales under a price list, in order to establish such price list as effective, but we cannot hold, as a matter of law, that in all cases there must be sales at the prices named in a price list, and that it is not effective prior to the date of such sales. This the lower court did, as we construe its decision, and we think this constitutes reversible error. * * *

In *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. Appls. 466, our appellate court stated as follows:

* * * The Pharma Chemical Corporation offered it for sale, not only in the principal markets, but throughout the United States, when it listed it and offered it to the general buying public through the proper governmental agency. It used its ordinary methods in offering the product for sale; the fact that its agents and distributors made no sales and no efforts to sell, not shown to be induced in any way by the manufacturer, does not seriously militate against this view. It is apparent that the market for such a product was extremely limited, in fact, confined to one buyer, the Cincinnati Chemical Co., a customer of the appellant. It will be noted the statute (sec. 402 [f]), does not require a sale of the product; it is sufficient if it be freely offered for sale.

In the more recent case of *White Lamb Finlay, Inc.* v. *United States*, 29 C. C. P. A. 199, our appellate court said:

In our opinion such offer of September 20, 1939, does constitute very substantial evidence warranting the trial judge and appellate division in finding the export value of the merchandise at the time of its exportation to the United States * * *

There are in evidence before me a number of special agent's reports, together with much other evidence of both the plaintiffs and defendant, a detailed statement of which is not considered necessary here, but all of which evidence has, nevertheless, had my careful examination and consideration. After a careful consideration of all the evidence before me, I find that the weight thereof establishes an export value for the steel rounds, steel flats, and steel squares covered by these three appeals, as follows:

| | |
|---|---|
| Jan. 1937 to Sept. 1937 | $1.20 per 100 lbs. ex mills |
| Oct. 1937 to August 1938 | $1.42 per 100 lbs. ex mills |
| Sept. 1938 to Sept. 1939 | $1.22 per 100 lbs. ex mills |

plus the following extras:

*Steel Rounds and Squares:*

| | |
|---|---|
| ³⁄₁₆ inches thick | 32 cents per 100 lbs. |
| ¼ inches thick | 22 cents per 100 lbs. |
| ⁵⁄₁₆ inches thick | 16½ cents per 100 lbs. |
| ⅜ inches thick | 11 cents per 100 lbs. |
| ½ inches thick | 5½ cents per 100 lbs. |
| 3⁹⁄₁₆ to 6 inches thick | 6½ cents per 100 lbs. |

*Steel Flats:*

| | |
|---|---|
| 5 to 6 inches wide by ½ to less than 1 inch thick | 6½ cents per 100 lbs. |
| 1½ to 6 inches wide by 1 to 1½ inches thick | 5½ cents per 100 lbs. |
| 1½ to 6 inches wide by over 1½ to 2 inches thick | 11 cents per 100 lbs. |

Judgment will be rendered accordingly.