UNITED STATES *v.* COX & FAHNER (STEEL UNION SHEET PILING, INC.) ET AL.

No. 7627.—Invoices dated Dusseldorf, Germany, June 16, 1937, etc.
Certified June 17, 1937, etc.
Entered at New York, N. Y., June 30, 1937; New Orleans, La., April 27, 1938, etc.
Entry Nos. 896373; 3493, etc.

Third Division, Appellate Term

(Decided November 23, 1948)

*David N. Edelstein,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the appellant.

*Eugene R. Pickrell* for the appellees.

Before CLINE, EKWALL, and COLE, Judges; EKWALL, J., dissenting

CLINE, Judge: These are applications by the Government for review of a decision of the trial court (Tilson, J.) holding that the merchandise herein was dutiable at certain enumerated amounts on the basis of export value. *Cox & Fahner (Steel Union Sheet Piling, Inc.) et al.* v. *United States,* 15 Cust. Ct. 451, Reap. Dec. 6232.

The merchandise covered by these applications is described as steel rounds, steel flats, and steel squares, all of which are considered to be steel bars. Claims as to all other merchandise were abandoned at the trial by counsel for the importers. The merchandise was exported from Germany on June 17, 1937, March 12, 1938, and January 5, 1939, and was appraised on the basis of foreign value at 115 reichsmarks per 1,000 kilos, less 3 per centum cash discount.

The Government contends that no statutory export value or United States value exists; that the importers have failed to sustain the burden of proving the correct dutiable value of the merchandise; and that the judgment of the trial court should be reversed and the appeals dismissed for lack of proof.

The appellees claim that there is no foreign value for the merchandise on the ground that sales in Germany for home consumption were restricted as to price, use, and resale; that sales to countries other than the United States were restricted as to resale; and that there were no sales of such or similar merchandise for home consumption in Germany. It is further claimed that the proper basis for valuation is the export value which is alleged to be $1.20 per 100 pounds for the 1937 importation, $1.42 per 100 pounds for the 1938 importation, and $1.22 per 100 pounds for the 1939 importation; or, in the alternative, that United States value is the correct dutiable value, and that such values are $1.45 per 100 pounds for the 1937 importation, $1.42 per 100 pounds for the 1938 importation, and $1.01 per 100 pounds for the 1939 importation.

This case was originally heard before Judge Dallinger, who found that the plaintiffs had proved that the appraiser erred in finding a foreign value, but had failed to prove either an export or a United States value for the merchandise. He therefore issued an order directing that the appeals be restored to the docket "for the purpose of giving the plaintiffs herein an opportunity to prove the cost of production of said merchandise." *Cox & Fahner (Steel Union Sheet Piling, Inc.) et al.* v. *United States*, 9 Cust. Ct. 492, Reap. Dec. 5665.

Thereafter a motion for a rehearing was made by the importers and denied by Judge Dallinger. Cross-applications for review of the decision and order of the trial court were filed by the importers and the Government. The Government then moved to dismiss the importers' application as being premature and the third division issued an order dismissing both applications for review without prejudice, since the trial judge had not determined the value of the merchandise. *United States* v. *Cox & Fahner (Steel Union Sheet Piling, Inc.) et al.*, 10 Cust. Ct. 535, Reap. Dec. 5809. This decision was affirmed by the Court of Customs and Patent Appeals. *Cox & Fahner (Steel Union-Sheet Piling, Inc.) et al.* v. *United States*, 31 C. C. P. A. 141, C. A. D. 264. In its decision that court said (p. 144):

\* \* \* In the case at bar we have no doubt that when a final decision is made by the trial judge he may review the entire record and consider all questions raised thereby, and an application for review of all such questions may be taken by either party.

The case was thereafter submitted to the trial court upon the original record, without any evidence as to the cost of production.

The trial court (Tilson, J.) found that there was no foreign value for the reason that the market in Germany for steel bars was restricted as to resale and that no such or similar bars were freely offered or sold in the home market. He held that the proper dutiable value was the export value and that such values were $1.20 per 100 pounds for the 1937 importation, $1.42 per 100 pounds for the 1938 importation, and $1.22 per 100 pounds for the 1939 importation, plus certain extras.

As to foreign value, the record establishes that the sale of steel bars for home consumption is controlled as to price and use. It appears from the affidavits of Joseph Drebber and Wilhelm Diehl (plaintiffs' collective exhibit 36 and exhibit 37) and the affidavit of Alexander Lechte (plaintiffs' exhibit 38) that at the period when the involved importations were made there existed in Germany a cartel, known as the Stahlwerksverband, having as its members all the manufacturers of steel bars in Germany; that it sold such merchandise to wholesalers and consumers for home consumption in Germany; that it limited each wholesaler to a certain district and stipulated that each wholesaler was to resell for use in his district at prices fixed by the Association of German Steel Wholesalers and was prohibited from exporting to foreign countries; that a penalty was imposed on wholesalers who violated these restrictions; that in all sales to consumers, the purchasers were required to consume or convert the merchandise in their own plants and not resell them; that a penalty was imposed upon consumers who violated these restrictions; that all sales and offers to sell by all concerns for home consumption in Germany were made with these restrictions; that all sales for export to countries other than the United States were made with a restriction that the purchasers could not resell for export to third countries. The statements in these affidavits are confirmed by the reports of Treasury Representative Charles Kruszewski (defendant's exhibit 41 and collective exhibit 42).

From this evidence it is clear that the merchandise was not freely offered for sale for home consumption to all purchasers in the ordinary course of trade within the meaning of section 402 (c) of the Tariff Act of 1930. Therefore, no foreign value for the merchandise can be found. *United States* v. *Wm. A. Foster & Co., Inc.* (*Standard Rolling Mills, Inc.*), 34 C. C. P. A. 9, C. A. D. 336.

The importers contend that the merchandise was freely offered for sale to all purchasers for export to the United States and that therefore an export value can be found. The Government contends that no export value exists because German syndicate restrictions and control of sales applied to all markets and because export sales to the United States were limited to three distributors in this country.

The only evidence that steel bars, rounds, and flats were freely offered to all purchasers for exportation to the United States is contained in the affidavit of Adolph Schmidt, manager of Stahlunion-Export G. m. b. H. (the exporter), as follows (plaintiffs' collective exhibit 35, par. 6):

(6) That from January 1st, 1937 to the date of the signing of this affidavit, steel bars, steel rounds and steel flats, the same as the steel products covered by the sales listed in Paragraph 5, were freely offered to all purchasers for export to the United States by Stahlunion-Export G. m. b. H. without any restrictions as to disposition at the following prices ex works Germany: * * *

This statement is not borne out by other evidence in the record, and must therefore be regarded as a mere conclusion of the witness which can have no weight as a statement of fact when all the facts upon which it is made are disclosed. *Jenkins Brothers* v. *United States,* 25 C. C. P. A. 90, 96, T. D. 49093.

Stahlunion-Export entered into three agreements by which the entire United States was allocated to three firms as follows:

Steel Union-Sheet Piling, Inc.— All of the United States except California, Nevada, Utah, Arizona, New Mexico, Oregon, Washington, Idaho, Montana, and Alaska.

Steel Union, Inc.—California, Nevada, Utah, Arizona, New Mexico, and British Columbia.

Cron & Dehn, Inc.— Washington, Oregon, Idaho, Montana, and Alaska.

The contract between Stahlunion-Export and Steel Union-Sheet Piling, Inc., provided that Stahlunion was to sell only to Steel Union-Sheet Piling, Inc., in the agreed territory, except as noted, and was to protect the importer in every possible way to insure to it an exclusive distribution of the products sold by the exporter. The importer agreed to buy only from the exporter such products as were handled by the exporter, but might buy elsewhere where the exporter could not furnish equal material at competitive prices or within necessary delivery dates.

The exception above referred to provided:

It shall be provided, however, that any other agent or distributor of Export may sell to a customer with principal offices within the above mentioned states for shipment into the territory of Union without violating this agreement. Similarly Union may sell to buyers within its territory for shipment into the territory of other agents but shall notify Export in advance of such intention.

This does not permit direct sales into the importer's territory, but allows other distributors to sell to a customer whose principal office is outside the area in which the importer holds an exclusive agency, even though shipment is made into that area. The exporter also reserved the right to sell direct to certain customers who maintained foreign buying offices, provided that the importer should be notified of such intention by the exporter.

The contract also provided:

Union may also sell exporters with offices within its territory for export to other countries *with the permission of Export.* [Italics supplied.]

This is a restriction on the disposition of the merchandise, since the importer could not sell for export to other countries without obtaining permission of the German syndicate. There is no evidence that such permission was ever granted nor that the contract was ever modified in that regard.

The contract between Stahlunion-Export and Steel Union, Inc., is similar to the one with Steel Union-Sheet Piling, Inc., except that it does not contain the provision above quoted in regard to sales to exporters.

The contract between Stahlunion-Export and Cron & Dehn, Inc., provides for commissions on all transactions negotiated by the latter in the district allocated to it, except for Juneau, Alaska, or firms purchasing in California, and for sales to Sears, Roebuck & Co. of all products and for sales to Montgomery Ward & Co. of wire products.

The three agreements taken together cover the entire United States, granting exclusive distribution rights to the three firms in their respective territories. Accordingly, the exporter did not freely offer its merchandise for exportation to the United States to all purchasers, but limited its sales to these three firms. None of these firms could sell directly to any purchaser having a principal office within the other's district, but only where the main office of the purchaser was located within the territorial district of the seller. Moreover, at least in the case of Steel Union-Sheet Piling, Inc., the merchandise could not be sold for export without permission of the exporter.

In view of these restrictions, it cannot be held that the merchandise was "freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States." (Tariff Act of 1930, sec. 402 (d).)

The circumstances in the instant case are similar to those in *United States* v. *Malhame & Co.*, 24 C. C. P. A. 448, T. D. 48911. In that case three Belgian manufacturers sold similar prayer books for export to the United States. It was conceded that Malhame & Co. was the exclusive agent in the United States of Henri Proost & Cie and that said manufacturer would sell only through Malhame & Co. except that one other firm in the United States was given the privilege of buying directly from such manufacturer. Similar books of other manufacturers were sold only through their exclusive agents in the United States. It was held that the merchandise was not freely offered to all purchasers for export to the United States; that the most that could be said was that there was an offering to three exclusive agents of three different manufacturers.

In the instant case there was an offering to three exclusive agents of one exporter. An export value cannot be found unless there is a free offering to *all* purchasers. Compare the case of *United States* v. *Heemsoth-Kerner Corp.*, 31 C. C. P. A. 75, C. A. D. 252, involving a somewhat similar situation where the court held that no United States value existed, stating (p. 81):

So, while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States, it is not freely offered for sale by appellee at such list prices in such principal market to purchasers in territories allotted to distributors, which territories cover a major portion of the United States. Therefore, it may not be held that it is freely offered for sale in the principal market to all purchasers in the ordinary course of the trade within the meaning of section 402 (e), *supra.* * * *

In the instant case the merchandise was not freely offered for sale by the exporter to all purchasers in the territories allotted to distributors, and such territories covered the entire United States. Therefore, no export value can be found.

Moreover, the evidence does not disclose sufficient uniformity in the prices paid for the merchandise to establish export value.

It appears from the record that the steel products involved herein were sold at a base price plus additional charges when dimensions varied from the norm. The affidavit of Adolph Schmidt, *supra*, lists the base prices as follows:

| January 1937 to September 1937 | $1.20 per 100 lbs. ex mills |
| October 1937 to August 1938 | $1.42 " " " " " |
| September 1938 to September 1939 | $1.22 " " " " " |

However, this statement is contradicted by other evidence in the record. In fact, appellees in their brief state that the base export value on June 17, 1937, was $1.45 per 100 pounds rather than $1.20 as set forth in the affidavit of Adolph Schmidt.

An examination of the data contained in plaintiffs' collective exhibits 10, 11, exhibits 12, 22, 23, and collective exhibit 24 discloses the following variations in prices: For merchandise exported between January and November 1937 the prices ranged from $1.07 to $1.27 with the majority of the sales at $1.25; for merchandise exported between November 1937 and August 1938 the prices ranged from $1.42 to $1.58 with the majority at $1.46; and for merchandise exported between August 1938 and April 1939 the prices ranged from $1.07 to $1.37 with the majority at $1.22 and $1.37. Some of the sales appear to have been made partly in dollars and partly in reichsmarks and the differences in prices may be explained by the following statement in the report of Customs Agent Malcolm Gerry (defendant's exhibit 39, pp. 4–5):

The extra prices thus obtained are found to be consistent with the price extras shown where purchases were made in Reichsmarks computed on the basis of forty and a fraction cents per mark. However, this substantiates the fact that

the base prices for steel bars in cases where payment was made partly in marks were 11%, and up, higher than the prices when payment was made by means of dollars converted into pounds sterling, as in the case of payments to Guiness, Mahon & Company.

In this connection particular attention is invited to Order No. 524 of August 23, 1938, in which the base price in one case is $1.64, whereas in the ofice [sic] case it was approximately $1.78.

This explanation, of course, does not establish a uniform price for the merchandise, but indicates that prices might be different depending upon the way payment was made.

In view of these facts, we are unable to hold that an export value has been established.

The question remains as to whether the importers have proved that a United States value for the merchandise existed at the respective dates of exportation thereof.

It appears from the record that all sales and offers to sell German steel bars were for future delivery; that the merchandise was not manufactured until after the order was placed. In that connection, Edward Barreau, president of Steel Union-Sheet Piling, Inc., testified:

X Q. Now, Mr. Barreau, you testified your selling agents made these sales or offers which you in New York had to confirm and which had to be confirmed by Stahlunion-Export in Germany. Then, where was the merchandise when you sent your salesmen out? Was it here in New York, or was it in Germany?—A. It didn't exist at all.

X Q. It didn't exist at all.—A. The merchandise is sold and made to order. After the order is taken it is customary in the steel business to start rolling.

X Q. Then it was imported subsequent to the time you made the sale in this country?—A. That is correct.

X Q. In all instances?—A. In all instances.

The importers' records of importations and sales of steel bars during the period and the tabulations setting forth the dates of sale and importation of every sale of steel bars by Steel Union-Sheet Piling, Inc., and Steel Union, Inc., confirm this testimony. (Plaintiffs' collective exhibits 2, 3, 4, 5, 10, 11, exhibits 12, 22, 23, and collective exhibit 24.)

Herbert Oberste-Lehn, secretary and sales manager of Steel Union, Inc., testified that his firm carried some stock of steel bars during 1937, 1938, and 1939, but that it consisted of merchandise imported to fill orders that had been cancelled. He did not state when this occurred nor the price at which such merchandise was offered for sale. Such sales are not, however, in the ordinary course of trade.

Under these circumstances, no United States value can be found. *United States* v. *Collin & Gissel*, 29 C. C. P. A. 96, C. A. D. 176; *United States* v. *New York Merchandise Co., Inc.*, 31 C. C. P. A. 213, C. A. D. 274. In the case first cited the importer did not keep a stock of machines on hand in the United States, but contacted customers for their sale and then placed orders with the foreign manufacturer.

When the machine arrived, it was invoiced to the purchaser by the importer and shipped to him from the port of entry. The court held that there was no United States value, stating (p. 102):

* * * No imported machine was in the United States available to be offered for sale by the importer at $5,500, or at any other price, on July 11, 1934, the date of exportation of the involved machine, nor at any time near that date. The statute defining United States value explicitly states, "The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale * * * in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise * * *," and it was definitely construed by us in the *Sheldon & Co.* case, *supra*, in the manner already stated. Clearly, had the importation here involved been a first importation of the particular type of merchandise at issue no United States value could be determined under the statutory definition which Congress adopted and, there being no prototype machine in the United States at or near the date of exportation of the involved machine available for offer, a fundamental element of United States value, as defined by the statute, was lacking. Upon the facts shown, in our opinion, no legal distinction can be drawn between the importation involved and a case of first importation.

In *United States* v. *New York Merchandise Co., Inc.*, *supra*, no United States value was found since the stock of merchandise on hand was all committed to contracts of sale entered into previously. The court set forth the requirements for finding a United States value as follows (p. 218):

The law upon the construction of section 402 (e), *supra*, is, we think, fairly well settled, and without quoting extensively from the foregoing cited cases, we think the following principles applicable to United States value are definitely settled: First, the value of the imported merchandise to be arrived at must be based upon the price at which such or similar *previously imported* merchandise is freely offered for sale to all purchasers, packed ready for delivery, etc., at the time of exportation of the imported merchandise. Second, the phrase "at the time of exportation" does not necessarily mean the hour or the day of exportation, but a time near enough to the date of exportation and under such circumstances as will reflect the price of the goods on the date of exportation. * * *

*United States* v. *Robert Reiner, Inc.*, 35 C. C. P. A. 50, C. A. D. 370, does not change the requirement that previously imported merchandise must have been freely offered for sale at or prior to the date of exportation of the merchandise being valued. In that case a United States value was found because the machines were not ordered for a specific customer, but were allotted to customers when they arrived in this country or from those which had previously arrived and were being held in warehouse by the importer.

In the instant case the merchandise was manufactured to fill specific orders and none was on hand to be freely offered for sale in the ordinary course of trade at or prior to the date of exportation. Therefore, no United States value can be found for the merchandise involved herein.

Moreover, the merchandise was sold in the United States only by the three distributors mentioned above and then only in their respective territories, except that a distributor might sell for shipment outside his territory in cases where the customer's principal office was located within his territory. Direct sales outside his territory were not permitted. Under such circumstances, it cannot be held that the merchandise was freely offered to all purchasers in the United States in the ordinary course of trade within the meaning of section 402 (e) of the Tariff Act of 1930. *United States* v. *Heemsoth-Kerner Corp.*, *supra*.

Since no foreign, export, or United States value can be found, the merchandise should be appraised on the basis of cost of production. This case was originally restored to the calendar by Judge Dallinger "for the purpose of giving the plaintiffs herein an opportunity to prove the cost of production of said merchandise," but after the proceedings outlined above, it was resubmitted by the parties "upon the record as heretofore made," the written stipulation stating no reason for the action. In view of such broad and general language, it cannot be said that the plaintiffs were unable or had refused to offer proof showing cost of production. Under these circumstances, we are of opinion that the interests of justice will be best served by remanding this case to the trial court for the purpose of giving the appellees herein an opportunity to prove the cost of production of the merchandise. The decision and judgment of the trial court is therefore reversed and the case remanded for further proceedings in accordance with this opinion.

Judgment will be rendered accordingly.

### DISSENTING OPINION

EKWALL, Judge: I am unable to agree with the opinion of the majority in this case, for the following reasons.

Judge Tilson in his decision held that no foreign value existed for these or similar steel bars for the reason that the market in Germany for this merchandise was restricted and that no similar merchandise was sold in Germany for home consumption. He further held that although such steel bars might have been offered at different prices on the same day, he was not precluded from using evidence of such offers in finding a value for the merchandise. Certain unrestricted offers to all purchasers of the instant merchandise, as set forth in collective exhibit 35 herein, were held to constitute export values within the meaning of that term as defined in the statute. The question of whether or not there was a United States value was not passed upon.

The evidence in the record before us consists of over 300 pages of oral testimony together with 53 documentary exhibits. A detailed

statement of the said exhibits would serve no useful purpose and only extend this decision unnecessarily.

Inasmuch as the appraiser found foreign value to be the basis of appraisement, I have examined the record in order to find whether any foundation exists for that finding. The record discloses that during the export period here involved, i. e., the years 1937, 1938, and 1939, minimum prices for commercial steel bars were fixed throughout the world by an International Steel Syndicate, the headquarters of which was at Luxemburg. This syndicate was subdivided into several National Steel Syndicates with headquarters in each of their respective countries. The national syndicate in Germany was known as the Stahlwerksverband of Dusseldorf. This is a cartel having as its members all the manufacturers of steel bars in Germany. The purpose of the Stahlwerksverband is to control and direct the entire disposition of all steel bars manufactured in Germany from the time of manufacture to the time of consumption in Germany. Not only are the prices and conditions of resale to wholesalers controlled but also the prices and conditions of resale at which the merchandise is sold by the wholesaler to the retailer and the consumer. Penalties for violations of prices and restrictions are fixed by the Stahlwerksverband and the Association of German Steel Wholesalers, which are made known to purchasers at the time the steel bars are offered for sale, the restrictions being imposed at the inception of the movement of the merchandise into commerce. This is the usual course of trade in offering and selling these commodities for home consumption in Germany. Further, it appears from the evidence that all sales of steel bars by Stahlwerksverband and its members for export to foreign countries other than the United States were made with the restriction that the purchasers could not resell for export to third countries.

It is clear to me that the sale of steel bars for home consumption in Germany is completely controlled as to price and use from manufacturer to consumer, and that sales to countries other than the United States are all made with a prohibition against export to any third country. Therefore, there is no foreign value for this merchandise. This conclusion was arrived at by both Judge Dallinger in his order, *Cox & Fahner (Steel Union Sheet Piling, Inc.) et al. v. United States*, 9 Cust. Ct. 492, Reap. Dec. 5665, and by Judge Tilson in his decision below.

Appellees claim that an export value exists for these steel bars. The Government contends in its brief that syndicate supervision and minimum prices apply on all markets, and that, therefore, they constitute a sufficient restriction and control which would preclude a finding of statutory foreign value, and likewise defeat the evidence of statutory export and United States value. This same contention was made before Judges Dallinger and Tilson. In arriving at a

determination of this question, Judge Dallinger used the following language:

* * * It is true that there was an "International Raw Steel Cartel," but according to the report of the Treasury representative, Karl M. Richards (defendant's exhibit 40), the said cartel included Belgium, France, Germany, Luxemburg, England, Poland, and Czechoslovakia. In other words, this so-called international syndicate was only an international European syndicate. To be sure, the plaintiffs' witness Barreau did testify on cross-examination that it was his "impression" that there existed a United States syndicate for export business. But a witness' impression cannot be accepted as evidence of the fact.

In its 1935 sales agreement (exhibit 1) the "Stahlunion-Export G. m. b. H.," the foreign seller and exporter herein, inserted in section III a proviso requiring its permission for export from the United States to other countries. The 1936 agreement between the exporter and importer (exhibit 20) does not contain such a proviso. Moreover, it appears that such a restriction was not in force on the dates of exportation herein, because paragraph 6 of article 35 explicitly states that there was no restriction of sales of such steel bars exported to the United States.

It is further contended on the part of appellant in the brief filed that the exporter herein does not freely offer such or similar steel bars to all purchasers for exportation to the United States, but limits its offers and sales to three territorial distributors only. Therefore, it claims that no export value exists for the steel bars here involved. In passing upon this point, Judge Dallinger in a finding agreed to by Judge Tilson, held that these sales did not constitute a restriction in the sale of such or similar merchandise for export to the United States. Judge Dallinger made use of the following language:

Counsel for the Government also raises the point that during the years 1937, 1938, and 1939, the export periods involved herein, the foreign exporter herein sold German steel bars for exportation to the United States to three territorial distributors only, to wit, Steel Union Sheet Piling, Inc., the importer herein, Steel Union, Inc., of Los Angeles, Calif., and Cron & Dehn of Seattle, Wash., and that therefore there existed no freely offered price to all purchasers for export to the United States, citing the case of *United States* v. *Malhame & Co.*, 24 C. C. P. A. 448, T. D. 48911.

It is to be noted, however, that the sales agreement with each of those concerns covers a variety of steel products, each agreement expressly reserving the right of direct sale by the foreign exporter, sales of a number of said products being made to other purchasers.

Furthermore, paragraph 6 of exhibit 35 expressly declares that such or similar steel bars to those involved herein were freely offered for all purposes [to all purchasers] for export to the United States without any restrictions as to resale. For this reason I am of the opinion that the case of *United States* v. *Malhame & Co.*, *supra*, has no application to the facts established herein.

For the above reasons I am satisfied that at the time of the exportation of the instant merchandise there was no restriction on the sale of such or similar merchandise for export to the United States.

A careful perusal of the evidence submitted leads me to the conclusion that the finding of the court below that an export value

existed at the time of exportation for these steel bars, is supported by substantial evidence.

Judge Tilson found values for the merchandise as follows:

Jan. 1937 to Sept. 1937_____ $1.20 per 100 lbs. ex mills
Oct. 1937 to Aug. 1938_____ $1.42 per 100 lbs. ex mills
Sept. 1938 to Sept. 1939_____ $1.22 per 100 lbs. ex mills

plus the following extras:

*Steel Rounds and Squares:*

3/16 inches thick_____ 32 cents per 100 lbs.
1/4 inches thick_____ 22 cents per 100 lbs.
5/16 inches thick_____ 16½ cents per 100 lbs.
3/8 inches thick_____ 11 cents per 100 lbs.
½ inches thick_____ 5½ cents per 100 lbs.
3 3/16 to 6 inches thick_____ 6½ cents per 100 lbs.

*Steel Flats:*

5 to 6 inches wide by ½ to less than 1 inch thick__ 6½ cents per 100 lbs.
1½ to 6 inches wide by 1 to 1½ inches thick_____ 5½ cents per 100 lbs.
1½ to 6 inches wide by over 1½ to 2 inches thick__ 11 cents per 100 lbs.

The record discloses that steel bars when sold for export to the United States are sold at a base price for certain so-called base sizes, with various "extras" for larger or smaller sizes. These extras are set forth in exhibit 8 in evidence and also appear with the base prices in paragraph 6 of exhibit 35. The testimony discloses that in billing, however, it frequently happened that an average price was used to cover an assortment of sizes rather than setting forth the base price and the individual extras. The actual values of the bars were therefore the individual values which went to make up the average price. In determining export value, the base price for export must be first determined to which can be added the applicable additions for extras.

Collective exhibit 35, an affidavit of Adolph Schmidt, manager of Stahlunion-Export G. m. b. H. relative to the sale of steel bars by that concern for export from Germany to foreign countries, sets out in paragraph 6 thereof the base prices of such steel bars, which the affiant states are freely offered to all purchasers for export to the United States, without any restrictions as to disposition. Those prices were:

January 1937 to September 1937_____ $1.20 per 100 lbs ex mills
October 1937 to August 1938_____ $1.42 " " " " "
September 1938 to September 1939_____ $1.22 " " " " "

Collective exhibits 10, 11, exhibits 12, 22, 23, and collective exhibit 24 list all the actual sales of steel bars by Stahlunion-Export G. m. b. H. to Steel Union Sheet Piling, Inc., and to Steel Union, Inc., during 1937, 1938, and 1939.

From these exhibits it appears to me that in only two instances were sales made for export at base prices above $1.50 per 100 pounds.

The court below found that the fact that the statement of the affiant Schmidt that such or similar merchandise was freely offered for sale to all purchasers for export to the United States at certain specified base prices, plus certain extra amounts varying according to the thickness of the steel bars in question, is not borne out by the prices set forth in the invoices attached to said affidavit, would not preclude the court from considering said invoices in finding a value for this merchandise. In this finding I concur. The fact that selling prices vary somewhat between one sale and another is no bar to a finding of export value based upon such sales. The courts have upon numerous occasions determined the value of merchandise even though sales prices were not uniform. In such cases the price at which *all* purchasers could buy is the highest price.

In the case of *Wm. J. Oberle, Inc.* v. *United States*, 5 Cust. Ct. 576, Reap. Dec. 5042, the court had under consideration certain okra imported from Cuba. There was in evidence in that case a list of 36 sales of similar merchandise, with prices ranging from $0.85 a hamper to $1.40. The court there said:

> * * * Within the judicial interpretation of the statutory phrase, "to all purchasers," as set forth in the case of *United States* v. *Mexican Products Co.*, 28 C. C. P. A. 80 (C. A. D. 129) and the cases therein cited, the freely offered price of the merchandise in question for exportation to the United States to all purchasers in said usual wholesale quantity is $1.40 per hamper, packed, and we so hold.

To the same effect are the cases of *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. 290, T. D. 46817, and *United States* v. *American Glanzstoff Corp.*, 24 C. C. P. A. 35, T. D. 48308.

Said collective exhibit 35 states the extras which are to be added to the basic prices above given to be as follows:

*Steel Rounds and Squares:*

| | | |
|---|---|---|
| ³⁄₁₆ inch thick | 32 | cts per 100 lbs. |
| ¼ " " | 22 | " " " |
| ⁵⁄₁₆ " " | 16½ | " " " |
| ⅜ " " | 11 | " " " |
| ½ " " | 5½ | " " " |
| ⅝ to 3½ inches thick | no extra | |
| 3³⁄₁₆ to 6 inches thick | 6½ cts per 100 lbs. | |

*Steel Flats:*

| * | * | * | * | * | * | * |
|---|---|---|---|---|---|---|

| | | |
|---|---|---|
| 5 to 6 inches wide by ½ to less than 1 inch thick | 6½ cts per 100 lbs. | |
| 1½ to 6 inches wide by 1 to 1½ inches thick | 5½ " " " |
| 1½ to 6 inches wide by over 1½ to 2 inches thick | 11 " " " |

A comparison of the freely offered prices as set forth in paragraph 6 of collective exhibit 35 with the prices on the invoices attached to said exhibit, as set out in column 11 of collective exhibits 10, 11, and exhibit 12, in my opinion, will disclose that there is very little difference

between the values given in the affidavit and those set forth on the attached invoices. (See column 14 of collective exhibits 10, 11, and exhibit 12 which sets forth unit prices per 100 pounds c. & f. United States ports; columns 23 and 25 setting forth freight and insurance per 100 pounds, respectively; and column 11 of these exhibits setting forth the unit prices ex works Germany per 100 pounds.)

Although it is unnecessary in view of the conclusion I have reached, i. e., that export value is the proper basis of valuation in this case, I deem it proper to express my views on the question of the existence of a United States value for these steel bars, in the event of an appeal to the United States Court of Customs and Patent Appeals. Lengthy discussions on this point would only serve to extend this decision unnecessarily. However, it is my opinion, in view of the evidence that when these steel bars are ordered in the United States, such merchandise is not in existence, as it is customary in the steel business to start rolling after the order is taken, that no United States value as defined in section 402 (e) of the Tariff Act of 1930, exists for this merchandise. The merchandise is imported subsequent to the order in all instances. Therefore, there was no prototype merchandise such as or similar to the instant merchandise available in the United States at the time of the placing of the orders in this country, or at the time of exportation of this merchandise. Under such circumstances, it has been held that there can be no United States value for the commodity. See *United States* v. *New York Merchandise Co., Inc.*, 31 C. C. P. A. (Customs) 213, C. A. D. 274.

Upon consideration of all of the evidence, including the special agents' reports, I arrive at the following conclusions:

The merchandise consists of steel bars, described as rounds, flats, and squares, exported from Germany during the years 1937, 1938, and 1939, which were appraised on the basis of foreign value at 115 reichsmarks per 1,000 kilos, less 3 per centum cash discount.

For the reasons above set forth, it is my opinion:

1. That at the time of exportation of these steel bars there existed in Germany, the country of exportation, no foreign value therefor.

2. That said steel bars were freely offered for sale, packed ready for delivery in the principal market of Germany, to all purchasers at the dates of exportation of said merchandise, in the usual wholesale quantities, i. e., one ton per size and up, in the ordinary course of trade at the prices following, and that such prices represent export value as defined in section 402 (d) of the Tariff Act of 1930:

| | |
|---|---|
| Jan. 1937 to Sept. 1937 | $1.20 per 100 lbs. ex mills |
| Oct. 1937 to August 1938 | $1.42 per 100 lbs. ex mills |
| Sept. 1938 to Sept. 1939 | $1.22 per 100 lbs. ex mills |

plus the following extras:

*Steel Rounds and Squares:*

$\frac{3}{16}$ inches thick_____ 32 cents per 100 lbs.
$\frac{1}{4}$ inches thick_____ 22 cents per 100 lbs.
$\frac{5}{16}$ inches thick_____ 16$\frac{1}{2}$ cents per 100 lbs.
$\frac{3}{8}$ inches thick_____ 11 cents per 100 lbs.
$\frac{1}{2}$ inches thick_____ 5$\frac{1}{2}$ cents per 100 lbs.
3$\frac{3}{16}$ to 6 inches thick_____ 6$\frac{1}{2}$ cents per 100 lbs.

*Steel Flats:*

5 to 6 inches wide by $\frac{1}{2}$ to less than 1 inch thick___ 6$\frac{1}{2}$ cents per 100 lbs.
1$\frac{1}{2}$ to 6 inches wide by 1 to 1$\frac{1}{2}$ inches thick_____ 5$\frac{1}{2}$ cents per 100 lbs.
1$\frac{1}{2}$ to 6 inches wide by over 1$\frac{1}{2}$ to 2 inches thick_ 11 cents per 100 lbs.

I think the decision of the trial court should be affirmed.